[S.F. No. 24368. Feb. 17, 1983.]

NATIONAL AUDUBON SOCIETY et al., Petitioners, v.
THE SUPERIOR COURT OF ALPINE COUNTY, Respondent;
DEPARTMENT OF WATER AND POWER OF THE CITY OF
LOS ANGELES et al., Real Parties in Interest.

420

**COUNSEL**

F. Bruce Dodge, Morrison & Foerster, Sanford M. Skaggs, Palmer Brown Madden, Marie P. Rivera and Van Voorhis & Skaggs for Petitioners.

Antonio Rossmann, Muenzberg & Thomson, James S. Thomson, Robin G. Pulich, Greene, Kelley & Tobriner, Frank A. Lowe, E. Clement Shute, Jr., and Shute, Mihaly & Weinberger as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Adolph Moskovitz, Kronick, Moskovitz, Tiedemann & Girard, Ira Reiner, City Attorney, Edward C. Farrell, Chief Assistant City Attorney, Kenneth W. Downey, Assistant City Attorney, George Deukmejian, John K. Van de Kamp, Attorneys General, R. H. Connett, N. Gregory Taylor, Assistant Attorneys General, Roderick E. Walston, Gregory K. Wilkinson, Jan S. Stevens, Dennis M. Eagan, M. Anne Jennings, Clifford T. Lee and Bruce S. Flushman, Deputy Attorneys General, John R. Bury, Tom P. Gilfoy, Philip Walsh, Jennifer Moran, Elizabeth J. Bigman, Carol E. Dinkins, United States Assistant Attorney General, Donald B. Ayer and Francis M. Goldsberry II, United States Attorneys, Stuart L. Somach and Mary Beth Uitti, Assistant United States Attorneys, Jacques B. Gelin, Richard J. Lazarus, Arthur L. Littleworth, Richard T. Anderson, Best, Best & Krieger for Real Parties in Interest.

Downey, Brand, Seymour & Rohwer, Anne J. Schneider, DeBlanc & Alexander and Anthony E. Alexander as Amici Curiae on behalf of Real Parties in Interest.

George Agnost, City Attorney (San Francisco), McMorris M. Dow, Jerome B. Falk, Jr., Brian E. Gray and Howard, Rice, Nemerovski, Canady & Pollak as Amici Curiae.

OPINION

**BROUSSARD, J.**—Mono Lake, the second largest lake in California, sits at the base of the Sierra Nevada escarpment near the eastern entrance to Yosemite National Park. The lake is saline; it contains no fish but supports a large population of brine shrimp which feed vast numbers of nesting and migratory birds. Islands in the lake protect a large breeding colony of California gulls, and the lake itself serves as a haven on the migration route for thousands of Northern Phalarope, Wilson's Phalarope, and Eared Grebe. Towers and spires of tufa on the north and south shores are matters of geological interest and a tourist attraction.

Although Mono Lake receives some water from rain and snow on the lake surface, historically most of its supply came from snowmelt in the Sierra Nevada. Five freshwater streams—Mill, Lee Vining, Walker, Parker and Rush Creeks—arise near the crest of the range and carry the annual runoff to the west shore of the lake. In 1940, however, the Division of Water Resources, the predecessor to the present California Water Resources Board,[1] granted the Department of Water and Power of the City of Los Angeles (hereafter DWP) a permit to appropriate virtually the entire flow of four of the five streams flowing into the lake. DWP promptly constructed facilities to divert about half the flow of these streams into DWP's Owens Valley aqueduct. In 1970 DWP completed a second diversion tunnel, and since that time has taken virtually the entire flow of these streams.

As a result of these diversions, the level of the lake has dropped; the surface area has diminished by one-third; one of the two principal islands in the lake has become a peninsula, exposing the gull rookery there to coyotes and other predators and causing the gulls to abandon the former island. The ultimate effect of continued diversions is a matter of intense dispute, but there seems little

---

[1]For convenience we shall refer to the state agency with authority to grant appropriative rights as the Water Board or the board, without regard to the various names which this agency has borne since it was first created in 1913.

doubt that both the scenic beauty and the ecological values of Mono Lake are imperiled.[2]

Plaintiffs filed suit in superior court to enjoin the DWP diversions on the theory that the shores, bed and waters of Mono Lake are protected by a public trust. Plaintiffs' suit was transferred to the federal district court, which requested that the state courts determine the relationship between the public trust doctrine and the water rights system, and decide whether plaintiffs must exhaust administrative remedies before the Water Board prior to filing suit. The superior court then entered summary judgments against plaintiffs on both matters, ruling that the public trust doctrine offered no independent basis for challenging the DWP diversions, and that plaintiffs had failed to exhaust administrative remedies. Plaintiffs petitioned us directly for writ of mandate to review that decision; in view of the importance of the issues presented, we issued an alternative writ. (See *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593].)

This case brings together for the first time two systems of legal thought: the appropriative water rights system which since the days of the gold rush has dominated California water law, and the public trust doctrine which, after evolving as a shield for the protection of tidelands, now extends its protective scope to navigable lakes. Ever since we first recognized that the public trust protects environmental and recreational values (*Marks* v. *Whitney* (1971) 6 Cal.3d 251 [98 Cal.Rptr. 790, 491 P.2d 374]), the two systems of legal thought have been on a collision course. (Johnson, *Public Trust Protection for Stream Flows and Lake Levels* (1980) 14 U.C. Davis L.Rev. 233.) They meet in a unique and dramatic setting which highlights the clash of values. Mono Lake is a scenic and ecological treasure of national significance, imperiled by continued diversions of water; yet, the need of Los Angeles for water is apparent, its reliance on rights granted by the board evident, the cost of curtailing diversions substantial.

Attempting to integrate the teachings and values of both the public trust and the appropriative water rights system, we have arrived at certain conclusions which we briefly summarize here. In our opinion, the core of the public trust doctrine is the state's authority as sovereign to exercise a continuous supervision and control over the navigable waters of the state and the lands underlying those waters. This authority applies to the waters tributary to Mono Lake and

---

[2]For discussion of the effect of diversions on the ecology of Mono Lake, see Young, *The Troubled Waters of Mono Lake* (Oct. 1981) National Geographic, at page 504; Jehl, Jr., *Mono Lake: A Vital Way Station for the Wilson's Phalarope* (Oct. 1981) National Geographic, at page 520; Hoff, *The Legal Battle Over Mono Lake* (Jan. 1982) Cal. Law., at page 28; (Cal. Dept. Water Resources, Rep. of the Interagency Task Force on Mono Lake (Dec. 1969) (hereafter Task Force Report)).

bars DWP or any other party from claiming a vested right to divert waters once it becomes clear that such diversions harm the interests protected by the public trust. The corollary rule which evolved in tideland and lakeshore cases barring conveyance of rights free of the trust except to serve trust purposes cannot, however, apply without modification to flowing waters. The prosperity and habitability of much of this state requires the diversion of great quantities of water from its streams for purposes unconnected to any navigation, commerce, fishing, recreation, or ecological use relating to the source stream. The state must have the power to grant nonvested usufructuary rights to appropriate water even if diversions harm public trust uses. Approval of such diversion without considering public trust values, however, may result in needless destruction of those values. Accordingly, we believe that before state courts and agencies approve water diversions they should consider the effect of such diversions upon interests protected by the public trust, and attempt, so far as feasible, to avoid or minimize any harm to those interests.

The water rights enjoyed by DWP were granted, the diversion was commenced, and has continued to the present without any consideration of the impact upon the public trust. An objective study and reconsideration of the water rights in the Mono Basin is long overdue. The water law of California—which we conceive to be an integration including both the public trust doctrine and the board-administered appropriative rights system—permits such a reconsideration; the values underlying that integration require it.

With regard to the secondary issue of exhaustion of administrative remedies, the powers, experience, and expertise of the Water Board all argue in favor of granting that agency primary jurisdiction. Long-established precedent, however, declares that courts have concurrent jurisdiction in water right controversies. The Legislature, instead of overturning that precedent, has implicitly acknowledged its vitality by providing a procedure under which the courts can refer water rights disputes to the water board as referee. We therefore conclude that the courts may continue to exercise concurrent jurisdiction, but note that in cases where the board's experience or expert knowledge may be useful the courts should not hesitate to seek such aid.

1. *Background and history of the Mono Lake litigation.*

DWP supplies water to the City of Los Angeles. Early in this century, it became clear that the city's anticipated needs would exceed the water available from local sources, and so in 1913 the city constructed an aqueduct to carry water from the Owens River 233 miles over the Antelope-Mojave plateau into the coastal plain and thirsty city.

The city's attempt to acquire rights to water needed by local farmers met with fierce, and at times violent, opposition. (See generally *County of Inyo* v. *Public Utilities Com.* (1980) 26 Cal.3d 154, 156-157 [161 Cal.Rptr. 172, 604 P.2d 566]; Kahrl, Water and Power: The Conflict Over Los Angeles' Water Supply in the Owens Valley (1982).) But when the "Owens Valley War" was over, virtually all the waters of the Owens River and its tributaries flowed south to Los Angeles. Owens Lake was transformed into an alkali flat.[3]

The city's rapid expansion soon strained this new supply, too, and prompted a search for water from other regions. The Mono Basin was a predictable object of this extension, since it lay within 50 miles of the natural origin of Owens River, and thus could easily be integrated into the existing aqueduct system.

After purchasing the riparian rights incident to Lee Vining, Walker, Parker and Rush Creeks, as well as the riparian rights pertaining to Mono Lake,[4] the city applied to the Water Board in 1940 for permits to appropriate the waters of the four tributaries. At hearings before the board, various interested individuals protested that the city's proposed appropriations would lower the surface level of Mono Lake and thereby impair its commercial, recreational and scenic uses.

The board's primary authority to reject that application lay in a 1921 amendment to the Water Commission Act of 1913, which authorized the board to reject an application "when in its judgment the proposed appropriation would not best conserve the public interest." (Stats. 1921, ch. 329, § 1, p. 443, now codified as Wat. Code, § 1255.)[5] The 1921 enactment, however, also "declared to be the established policy of this state that the use of water for domestic purposes is the highest use of water" (*id.*, now codified as Wat. Code, § 1254), and directed the Water Board to be guided by this declaration of policy. Since DWP sought water for domestic use, the board concluded that it had to grant the application notwithstanding the harm to public trust uses of Mono Lake.[6]

---

[3]Ironically, among the decisions reviewed in preparing this opinion was one in which Los Angeles was held liable for permitting water to flow into Owens Lake, damaging mineral extraction facilities constructed in reliance on the city taking the entire flow of the Owens River. (*Natural Soda Prod. Co.* v. *City of L.A.* (1943) 23 Cal.2d 193 [143 P.2d 12].)

[4]Between 1920 and 1934, the city purchased lands riparian to creeks feeding Mono Lake and riparian rights incident to such lands. In 1934, the city brought an eminent domain proceeding for condemnation of the rights of Mono Lake landowners. (*City of Los Angeles* v. *Aitken* (1935) 10 Cal.App.2d 460 [52 P.2d 585].)

[5]In theory, the board could have rejected the city's application on the ground that the waters of the streams were already being put to beneficial use or that the DWP proposed an unreasonable use of water in violation of article X, section 2 of the California Constitution. It does not appear that the board considered either proposition.

[6]DWP calls our attention to a 1940 decision of the Water Board involving Rock Creek, a tributary of the Owens River, in which the board stated that "the Water Commission Act requires it to protect streams in recreational areas by guarding against depletion below some minimum amount consonant with the general recreational conditions and the character of the

The board's decision states that "[i]t is indeed unfortunate that the City's proposed development will result in decreasing the aesthetic advantages of Mono Basin but *there is apparently nothing that this office can do to prevent it.* The use to which the City proposes to put the water under its Applications . . . is defined by the Water Commission Act as the highest to which water may be applied and to make available unappropriated water for this use the City has, by the condemnation proceedings described above, acquired the littoral and riparian rights on Mono Lake and its tributaries south of Mill Creek. This office therefore has *no alternative but to dismiss all protests based upon the possible lowering of the water level in Mono Lake and the effect that the diversion of water from these streams may have upon the aesthetic and recreational value of the Basin.*" (Div. Wat. Resources Dec. 7053, 7055, 8042 & 8043 (Apr. 11, 1940), at p. 26, italics added.)[7]

By April of 1941, the city had completed the extension of its aqueduct system into the Mono Basin by construction of certain conduits, reservoirs at Grant and Crowley Lakes, and the Mono Craters Tunnel from the Mono Basin to the Owens River. In the 1950's, the city constructed hydroelectric power plants along the system to generate electricity from the energy of the appropriated water as it flowed downhill into the Owens Valley. Between 1940 and 1970, the city diverted an average of 57,067 acre-feet of water per year from the Mono Basin. The impact of these diversions on Mono Lake was clear and immediate: the lake's surface level receded at an average of 1.1 feet per year.

In June of 1970, the city completed a second aqueduct designed to increase the total flow into the aqueduct by 50 percent.[8] Between 1970 and 1980, the city

stream." (Div. Wat. Resources Dec. 3850 (Apr. 11, 1940), at p. 24.) The decision concluded that the board had insufficient information to decide what conditions, if any, to place upon DWP's application to divert water from Rock Creek for hydroelectric generation.

We do not know why the board was seemingly more willing to limit diversions to protect recreational values for Rock Creek than for the creeks flowing into Mono Lake. (Neither do we know the eventual outcome of the Rock Creek application.) The language of the board's opinions suggests that the crucial distinction was that the application for the Mono Lake streams was for domestic use, the highest use under the Water Code, while the Rock Creek application was for power generation.

[7]Plaintiffs submitted an interrogatory to the present Water Board, inquiring: "Do you contend that the predecessor of the Water Board, at the time it issued the DWP appropriation permit, held the view that, notwithstanding the protests based on environmental concerns, it had no alternative but to issue DWP the permits DWP sought to export water from the Mono Basin?"

The Water Board replied: "The [Water] Board believes that its predecessor did hold the view that, notwithstanding protests based upon loss of land values resulting from diminished recreational opportunity, if unappropriated water is available, it had no alternative but to issue DWP the permits DWP sought in order to export water from the Mono Basin . . . ."

[8]In 1974 the Water Board confirmed that DWP had perfected its appropriative right by the actual taking and beneficial use of water, and issued two permanent licenses (board licenses Nos. 10191 and 10192) authorizing DWP to divert up to 167,000 acre-feet annually (far more than the average annual flow) from Lee Vining, Walker, Parker and Rush Creeks. The Water Board viewed this action as a ministerial action, based on the 1940 decision, and held no hearings on the matter.

diverted an average of 99,580 acre-feet per year from the Mono Basin. By October of 1979, the lake had shrunk from its prediversion area of 85 square miles to an area of 60.3 square miles. Its surface level had dropped to 6,373 feet above sea level, 43 feet below the prediversion level.[9]

No party seriously disputes the facts set forth above. However, the parties hotly dispute the projected effects of future diversions on the lake itself, as well as the indirect effects of past, present and future diversions on the Mono Basin environment.

DWP expects that its future diversions of about 100,000 acre-feet per year will lower the lake's surface level another 43 feet and reduce its surface area by about 22 square miles over the next 80 to 100 years, at which point the lake will gradually approach environmental equilibrium (the point at which inflow from precipitation, groundwater and nondiverted tributaries equals outflow by evaporation and other means). At this point, according to DWP, the lake will stabilize at a level 6,330 feet above the sea's, with a surface area of approximately 38 square miles. Thus, by DWP's own estimates, unabated diversions will ultimately produce a lake that is about 56 percent smaller on the surface and 42 percent shallower than its natural size.

Plaintiffs consider these projections unrealistically optimistic. They allege that, 50 years hence, the lake will be at least 50 feet shallower than it now is, and hold less than 20 percent of its natural volume. Further, plaintiffs fear that "the lake will not stabilize at this level," but "may continue to reduce in size until it is dried up." Moreover, unlike DWP, plaintiffs believe that the lake's gradual recession indirectly causes a host of adverse environmental impacts. Many of these alleged impacts are related to an increase in the lake's salinity, caused by the decrease in its water volume.

As noted above, Mono Lake has no outlets. The lake loses water only by evaporation and seepage. Natural salts do not evaporate with water, but are left behind. Prior to commencement of the DWP diversions, this naturally rising salinity was balanced by a constant and substantial supply of fresh water from the tributaries. Now, however, DWP diverts most of the fresh water inflow. The resultant imbalance between inflow and outflow not only diminishes the lake's size, but also drastically increases its salinity.

---

[9]In 1979 the California Department of Water Resources and the United States Department of the Interior undertook a joint study of the Mono Basin. The study recommends that the level of Mono Lake be stabilized at 6,388 feet. To achieve this end it recommended that exports of water from the Mono Basin be reduced from the present average of 100,000 acre-feet annually to a limit of 15,000 acre-feet. (Task Force Report at pp. 36-55.) Legislation was introduced to implement this recommendation, but was not enacted.

Plaintiffs predict that the lake's steadily increasing salinity, if unchecked, will wreck havoc throughout the local food chain. They contend that the lake's algae, and the brine shrimp and brine flies that feed on it, cannot survive the projected salinity increase. To support this assertion, plaintiffs point to a 50 percent reduction in the shrimp hatch for the spring of 1980 and a startling 95 percent reduction for the spring of 1981. These reductions affirm experimental evidence indicating that brine shrimp populations diminish as the salinity of the water surrounding them increases. (See Task Force Report at pp. 20-21.) DWP admits these substantial reductions, but blames them on factors other than salinity.

DWP's diversions also present several threats to the millions of local and migratory birds using the lake. First, since many species of birds feed on the lake's brine shrimp, any reduction in shrimp population allegedly caused by rising salinity endangers a major avian food source. The Task Force Report considered it "unlikely that any of Mono Lake's major bird species . . . will persist at the lake if populations of invertebrates disappear." (Task Force Report at p. 20.) Second, the increasing salinity makes it more difficult for the birds to maintain osmotic equilibrium with their environment.[10]

The California gull is especially endangered, both by the increase in salinity and by loss of nesting sites. Ninety-five percent of this state's gull population and 25 percent of the total species population nests at the lake. (Task Force Report at p. 21.) Most of the gulls nest on islands in the lake. As the lake recedes, land between the shore and some of the islands has been exposed, offering such predators as the coyote easy access to the gull nests and chicks. In 1979, coyotes reached Negrit Island, once the most popular nesting site, and the number of gull nests at the lake declined sharply. In 1981, 95 percent of the hatched chicks did not survive to maturity. Plaintiffs blame this decline and alarming mortality rate on the predator access created by the land bridges; DWP suggests numerous other causes, such as increased ambient temperatures and human activities, and claims that the joining of some islands with the mainland is offset by the emergence of new islands due to the lake's recession.

Plaintiffs allege that DWP's diversions adversely affect the human species and its activities as well. First, as the lake recedes, it has exposed more than

---

[10]In the face of rising salinity, birds can maintain such equilibrium only by increasing either their secretion of salts or their intake of fresh water. The former option is foreclosed, however, because Mono Lake is already so salty that the birds have reached their limit of salt secretion. Thus, the birds must drink more fresh water to maintain the osmotic equilibrium necessary to their survival. As the Task Force predicts, "[t]he need for more time and energy to obtain fresh water will mean reduced energy and time for other vital activities such as feeding, nesting, etc. Birds attempting to breed at Mono Lake . . . are likely to suffer the most from direct salinity effects, since the adult birds must devote so much time to obtain fresh water that they may not be able to raise young successfully." (Task Force Report, at p. 19.)

18,000 acres of lake bed composed of very fine silt which, once dry, easily becomes airborne in winds. This silt contains a high concentration of alkali and other minerals that irritate the mucous membranes and respiratory systems of humans and other animals. (See Task Force Report at p. 22.) While the precise extent of this threat to the public health has yet to be determined, such threat as exists can be expected to increase with the exposure of additional lake bed. DWP, however, claims that its diversions neither affect the air quality in Mono Basin nor present a hazard to human health.

Furthermore, the lake's recession obviously diminishes its value as an economic, recreational, and scenic resource. Of course, there will be less lake to use and enjoy. The declining shrimp hatch depresses a local shrimping industry. The rings of dry lake bed are difficult to traverse on foot, and thus impair human access to the lake, and reduce the lake's substantial scenic value. Mono Lake has long been treasured as a unique scenic, recreational and scientific resource (see, e.g., *City of Los Angeles* v. *Aitken, supra,* 10 Cal.App.2d 460, 462-463; Task Force Report at pp. 22-24), but continued diversions threaten to turn it into a desert wasteland like the dry bed of Owens Lake.

 To abate this destruction, plaintiffs filed suit for injunctive and declaratory relief in the Superior Court for Mono County on May 21, 1979.[11] DWP moved to change venue. When the court granted the motion and transferred the case to Alpine County, DWP sought an extraordinary writ to bar this transfer. The writ was denied, and the Superior Court for Alpine County set a tentative trial date for March of 1980.

In January of that year, DWP cross-complained against 117 individuals and entities claiming water rights in the Mono Basin. On February 20, 1980, one cross-defendant, the United States, removed the case to the District Court for the Eastern District of California. On DWP's motion, the district court stayed its proceedings under the federal abstention doctrine[12] to allow resolution by

---

[11]DWP contended that plaintiffs lack standing to sue to enjoin violations of the public trust, citing *Antioch* v. *Williams Irr. Dist.* (1922) 188 Cal. 451 [205 P. 688] and *Miller & Lux* v. *Enterprise etc. Co.* (1904) 142 Cal. 208 [75 P. 770], both of which held that only the state or the United States could sue to enjoin diversions which might imperil downstream navigability. Judicial decisions since those cases, however, have greatly expanded the right of a member of the public to sue as a taxpayer or private attorney general. (See *Van Atta* v. *Scott* (1980) 27 Cal.3d 424, 447-450 [166 Cal.Rptr. 149, 613 P.2d 210], and cases there cited.) Consistently with these decisions, *Marks* v. *Whitney, supra,* 6 Cal.3d 251, expressly held that any member of the general public (p. 261) has standing to raise a claim of harm to the public trust. (Pp. 261-262; see also *Environmental Defense Fund, Inc.* v. *East Bay Mun. Utility Dist.* (1980) 26 Cal.3d 183 [161 Cal.Rptr. 466, 605 P.2d 1], in which we permitted a public interest organization to sue to enjoin allegedly unreasonable uses of water.) We conclude that plaintiffs have standing to sue to protect the public trust.

[12]The federal practice of abstention sprang from the decision in *Railroad Comm'n.* v. *Pullman Co.* (1941) 312 U.S. 496 [85 L.Ed. 971, 61 S.Ct. 643]. (See generally, Wright et al., Federal Practice and Procedure, § 4241 et seq.) In *Pullman,* the Supreme Court held that, where resolu-

California courts of two important issues of California law: "1. What is the interrelationship of the public trust doctrine and the California water rights system, in the context of the right of the Los Angeles Department of Water and Power ('Department') to divert water from Mono Lake pursuant to permits and licenses issued under the California water rights system? In other words, is the public trust doctrine in this context subsumed in the California water rights system, or does it function independently of that system? Stated differently, can the plaintiffs challenge the Department's permits and licenses by arguing that those permits and licenses are limited by the public trust doctrine, or must the plaintiffs challenge the permits and licenses by arguing that the water diversions and uses authorized thereunder are not 'reasonable or beneficial' as required under the California water rights system? [¶] 2. Do the exhaustion principles applied in the water rights context apply to plaintiffs' action pending in the United States District Court for the Eastern District of California?"[13]

In response to this order, plaintiffs filed a new complaint for declaratory relief in the Alpine County Superior Court.[14] On November 9,

---

tion of an open state question presented in a federal action might prevent the federal court from reaching a constitutional question in that action, the court should stay its proceedings and order the parties to seek resolution of the state question in state courts. In *Pullman*-type cases, the federal court retains jurisdiction so that it may either apply the resolved state law, or resolve the state question itself if the state courts refuse to do so for any reason.

Though federal abstention was originally limited to *Pullman*-type cases, the grounds for abstention were later expanded in accordance with the policies of federalism. Abstention is now "appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." (*Colorado River Water Cons. Dist.* v. *U.S.* (1976) 424 U.S. 800, 814 [47 L.Ed.2d 483, 496, 96 S.Ct. 1236], citing *Louisiana P. & L. Co.* v. *Thibodaux City* (1959) 360 U.S. 25 [3 L.Ed.2d 1058, 79 S.Ct. 1070] and *Kaiser Steel Corp.* v. *W. S. Ranch Co.* (1968) 391 U.S. 593 [20 L.Ed.2d 835, 88 S.Ct. 1753].)

*Kaiser Steel* is similar to the case at bar. In that diversity case, W. S. Ranch Co. sued Kaiser Steel for trespass. Kaiser claimed that a New Mexico statute authorized it to trespass as necessary for use of its water rights granted by New Mexico. The ranch replied that if the statute so authorized Kaiser, the statute would violate the state constitution, which allowed the taking of private property only for "public use." Both the district court and the court of appeals reached the merits of the case after denying Kaiser's motion to stay the determination until conclusion of a declaratory relief action then pending in New Mexico courts. The United States Supreme Court reversed, reasoning in a *per curiam* opinion that "[t]he Court of Appeals erred in refusing to stay its hand. The state law issue which is crucial in this case is one of vital concern in the arid State of New Mexico, where water is one of the most valuable natural resources. The issue, moreover, is truly a novel one . . . [, and] will eventually have to be resolved by the New Mexico courts . . . . Sound judicial administration requires that the parties in this case be given the benefit of the same rule of law which will apply to all other businesses and landowners concerned with the use of this vital state resource." (*Kaiser Steel Corp.* v. *W. S. Ranch Co., supra,* 391 U.S. at p. 594 [20 L.Ed.2d at p. 837.)

[13]DWP objected to the form of the abstention order, and petitioned the United States Court of Appeals for the Ninth Circuit for leave to file an interlocutory appeal. The Ninth Circuit denied this petition.

[14]DWP argues that the second superior court action, filed after the federal court's abstention order, constitutes a request for an advisory opinion and thus seeks relief beyond the jurisdiction of the California courts. (See *Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 119-120 [145

1981, that court entered summary judgment against plaintiffs. Its notice of intended ruling stated that "[t]he California water rights system is a comprehensive and exclusive system for determining the legality of the diversions of the City of Los Angeles in the Mono Basin . . . . The Public Trust Doctrine does not function independently of that system. This Court concludes that as regards the right of the City of Los Angeles to divert waters in the Mono Basin that the Public Trust Doctrine is subsumed in the water rights system of the state." With respect to exhaustion of administrative remedies, the superior court concluded that plaintiffs would be required to exhaust their remedy before the Water Board either under a challenge based on an independent public trust claim or one based on asserted unreasonable or nonbeneficial use of appropriated water.

Plaintiffs filed a petition for mandate directly with this court to review the summary judgment of the Alpine County Superior Court. We issued an alternative writ and set the case for argument.

## 2. *The Public Trust Doctrine in California.*

"By the law of nature these things are common to mankind—the air, running water, the sea and consequently the shores of the sea." (Institutes of Justinian

---

Cal.Rptr. 674, 577 P.2d 1014], and cases there cited.) No California case has discussed the propriety of a declaratory relief action filed to resolve an unsettled issue of California law following a federal court abstention. A holding that such a suit is an improper attempt to obtain an advisory opinion, however, would constitute a decision by the California courts to refuse to cooperate in the federal abstention procedure. It would thus compel federal courts to decide unsettled questions of California law which under principles of sound judicial administration (see *Kaiser Steel Corp.* v. *W. S. Ranch Co., supra,* 391 U.S. 593, 594 [20 L.Ed.2d 835, 837]) should be resolved by the state courts.

The usual objections to advisory opinions do not apply to the present case. This is not a collusive suit (compare *People* v. *Pratt* (1866) 30 Cal. 223), nor an attempt to get the courts to resolve a hypothetical future disagreement (compare *Younger* v. *Superior Court, supra,* 21 Cal.3d 102). It is, rather, one phase of a hotly contested current controversy. The only conceivable basis for refusing to decide the present case is that our decision will not finally resolve that controversy, but will serve only as an interim resolution of some issues necessary to the final decision. That fact, however, is insufficient to render the issue nonjusticiable. As the Court of Appeal stated in response to a similar contention, it is in the interest of the parties and the public that a determination be made; "even if that determination be but one step in the process, it is a useful one." (*Regents of University of California* v. *State Bd. of Equalization* (1977) 73 Cal.App.3d 660, 664 [140 Cal.Rptr. 857].)

If the issue of justiciability is in doubt, it should be resolved in favor of justiciability in cases of great public interest. (See, e.g., *California Physicians' Service* v. *Garrison* (1946) 28 Cal.2d 790, 801 [172 P.2d 4, 167 A.L.R. 306] [trial court's determination of justiciability will not be overturned on appeal absent clear showing of abuse of discretion]; *Golden Gate Bridge etc. Dist.* v. *Felt* (1931) 214 Cal. 308, 315-319 [5 P.2d 585] [jurisdiction retained over admittedly friendly suit of public importance, where dismissal would have delayed construction of Golden Gate Bridge]; *California Water & Telephone Co.* v. *County of Los Angeles* (1967) 253 Cal.App.2d 16, 26 [61 Cal.Rptr. 618] [doubts about the justiciability of a dispute should be resolved in favor of immediate adjudication, where "the public is interested in the settlement of the dispute."].)

2.1.1.) From this origin in Roman law, the English common law evolved the concept of the public trust, under which the sovereign owns "all of its navigable waterways and the lands lying beneath them 'as trustee of a public trust for the benefit of the people.'" (*Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 416 [62 Cal.Rptr. 401, 432 P.2d 3].)[15] The State of California acquired title as trustee to such lands and waterways upon its admission to the union (*City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 521 [162 Cal.Rptr. 327, 606 P.2d 362] and cases there cited); from the earliest days (see *Eldridge* v. *Cowell* (1854) 4 Cal. 80, 87) its judicial decisions have recognized and enforced the trust obligation.[16]

Three aspects of the public trust doctrine require consideration in this opinion: the purpose of the trust; the scope of the trust, particularly as it applies to the nonnavigable tributaries of a navigable lake; and the powers and duties of the state as trustee of the public trust. We discuss these questions in the order listed.

(a) *The purpose of the public trust.*

The objective of the public trust has evolved in tandem with the changing public perception of the values and uses of waterways. As we observed in *Marks* v. *Whitney, supra,* 6 Cal.3d 251, "[p]ublic trust easements [were] traditionally defined in terms of navigation, commerce and fisheries. They have been held to include the right to fish, hunt, bathe, swim, to use for boating and general recreation purposes the navigable waters of the state, and to use the bottom of the navigable waters for anchoring, standing, or other purposes." (P. 259.) We went on, however, to hold that the traditional triad of uses—navigation, commerce and fishing—did not limit the public interest in the trust res. In language of special importance to the present setting, we stated that "[t]he public uses to which tidelands are subject are sufficiently flexible to encompass changing public needs. In administering the trust the state is not burdened with an outmoded classification favoring one mode of utilization over another. [Citation.] There is a growing public recognition that one of the most important public uses of the tidelands—a use encompassed within the tidelands trust—is the preservation of those lands in their natural state, so that they may

[15]Spanish law and subsequently Mexican law also recognized the public trust doctrine. (See *City of Los Angeles* v. *Venice Peninsula Properties* (1982) 31 Cal.3d 288, 297 [182 Cal.Rptr. 599, 644 P.2d 792].) Commentators have suggested that the public trust rights under Hispanic law, guaranteed by the Treaty of Guadalupe Hidalgo, serve as an independent basis for the public trust doctrine in California. (See Stevens, *The Public Trust: A Sovereign's Ancient Prerogative Becomes the People's Environmental Right* (1980) 14 U.C. Davis L.Rev. 195, 197; Dyer, *California Beach Access: The Mexican Law and the Public Trust* (1972) 2 Ecology L.Q. 571.)

[16]For the history of the public trust doctrine, see generally Sax, *The Public Trust Doctrine In Natural Resource Law: Effective Judicial Intervention* (1970) 68 Mich.L.Rev. 471; Stevens, *op. cit. supra,* 14 U.C. Davis L.Rev. 195.

serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area." (Pp. 259-260.)

■ Mono Lake is a navigable waterway. (*City of Los Angeles* v. *Aitken, supra,* 10 Cal.App.2d 460, 466.) It supports a small local industry which harvests brine shrimp for sale as fish food, which endeavor probably qualifies the lake as a "fishery" under the traditional public trust cases. The principal values plaintiffs seek to protect, however, are recreational and ecological—the scenic views of the lake and its shore, the purity of the air, and the use of the lake for nesting and feeding by birds. Under *Marks* v. *Whitney, supra,* 6 Cal.3d 251, it is clear that protection of these values is among the purposes of the public trust.

(b) *The scope of the public trust.*

Early English decisions generally assumed the public trust was limited to tidal waters and the lands exposed and covered by the daily tides (see Stevens, *op. cit. supra,* 14 U.C. Davis L.Rev. 195, 201 and authorities there cited); many American decisions, including the leading California cases, also concern tidelands. (See, e.g., *City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515 [162 Cal.Rptr. 327, 606 P.2d 362]; *Marks* v. *Whitney, supra,* 6 Cal.3d 251; *People* v. *California Fish Co.* (1913) 166 Cal. 576 [138 P. 79].) ■ It is, however, well settled in the United States generally and in California that the public trust is not limited by the reach of the tides, but encompasses all navigable lakes and streams. ■ ■■■ (See *Illinois Central Railroad Co.* v. *Illinois* (1892) 146 U.S. 387 [36 L.Ed. 1018, 13 S.Ct. 110] (Lake Michigan); *State of California* v. *Superior Court (Lyon)* (1981) 29 Cal.3d 210 [172 Cal.Rptr. 696, 625 P.2d 239] (Clear Lake); *State of California* v. *Superior Court (Fogerty)* (1981) 29 Cal.3d 240 [172 Cal.Rptr. 713, 625 P.2d 256] (Lake Tahoe); *People* v. *Gold Run D. & M. Co.* (1884) 66 Cal. 138 [4 P. 1152] (Sacramento River); *Hitchings* v. *Del Rio Woods Recreation & Park Dist.* (1976) 55 Cal.App.3d 560 [127 Cal.Rptr. 830] (Russian River).)[17]

■ Mono Lake is, as we have said, a navigable waterway. The beds, shores and waters of the lake are without question protected by the public trust. The streams diverted by DWP, however, are not themselves navigable. Accordingly, we must address in this case a question not discussed in any recent public trust case—whether the public trust limits conduct affecting nonnavigable tributaries to navigable waterways.

---

[17]A waterway usable only for pleasure boating is nevertheless a navigable waterway and protected by the public trust. (See *People* ex rel. *Younger* v. *County of El Dorado* (1979) 96 Cal.App.3d 403 [157 Cal.Rptr. 815] (South Fork of American River); *People* ex rel. *Baker* v. *Mack* (1971) 19 Cal.App.3d 1040 [97 Cal.Rptr. 448] (Fall River).)

This question was considered in two venerable California decisions. The first, *People* v. *Gold Run D. & M. Co.*, *supra*, 66 Cal. 138 [4 P. 1152], is one of the epochal decisions of California history, a signpost which marked the transition from a mining economy to one predominately commercial and agricultural. The Gold Run Ditch and Mining Company and other mining operators used huge water cannon to wash gold-bearing gravel from hillsides; in the process they dumped 600,000 cubic yards of sand and gravel annually into the north fork of the American River. The debris, washed downstream, raised the beds of the American and Sacramento Rivers, impairing navigation, polluting the waters, and creating the danger that in time of flood the rivers would turn from their channels and inundate nearby lands.

Although recognizing that its decision might destroy the remains of the state's gold mining industry, the court affirmed an injunction barring the dumping. The opinion stressed the harm to the navigability of the Sacramento River, "a great public highway, in which the people of the State have paramount and controlling rights." (P. 146.) Defendant's dumping, the court said, was "an unauthorized invasion of the rights of the public to its navigation." (P. 147.) Rejecting the argument that dumping was sanctioned by custom and legislative acquiescence, the opinion asserted that "the rights of the people in the navigable rivers of the State are paramount and controlling. The State holds the absolute right to all navigable waters and the soils under them . . . . The soil she holds as trustee of a public trust for the benefit of the people; and she may, by her legislature, grant it to an individual; but she cannot grant the rights of the people to the use of the navigable waters flowing over it . . . ." (Pp. 151-152.)

In the second decision, *People* v. *Russ* (1901) 132 Cal. 102 [64 P. 111], the defendant erected dams on sloughs which adjoined a navigable river. Finding the sloughs nonnavigable, the trial court gave judgment for defendant. We reversed, directing the trial court to make a finding as to the effect of the dams on the navigability of the river. "Directly diverting waters in material quantities from a navigable stream may be enjoined as a public nuisance. Neither may the waters of a navigable stream be diverted in substantial quantities by drawing from its tributaries . . . . If the dams upon these sloughs result in the obstruction of Salt River as a navigable stream, they constitute a public nuisance." (P. 106.)

DWP points out that the *Gold Run* decision did not involve diversion of water, and that in *Russ* there had been no finding of impairment to navigation. But the principles recognized by those decisions apply fully to a case in which diversions from a nonnavigable tributary impair the public trust in a downstream river or lake. "If the public trust doctrine applies to constrain *fills* which destroy navigation and other public trust uses in navigable waters, it should equally apply to constrain the *extraction* of water that destroys navigation and

other public interests. Both actions result in the same damage to the public interest." (Johnson, *Public Trust Protection for Stream Flows and Lake Levels* (1980) 14 U.C. Davis L.Rev. 233, 257-258; see Dunning, *The Significance of California's Public Trust Easement for California Water Rights Law* (1980) 14 U.C. Davis L.Rev. 357, 359-360.)

We conclude that the public trust doctrine, as recognized and developed in California decisions, protects navigable waters[18] from harm caused by diversion of nonnavigable tributaries.[19]

(c) *Duties and powers of the state as trustee.*

In the following review of the authority and obligations of the state as administrator of the public trust, the dominant theme is the state's sovereign power and duty to exercise continued supervision over the trust. One consequence, of importance to this and many other cases, is that parties acquiring rights in trust property generally hold those rights subject to the trust, and can assert no vested right to use those rights in a manner harmful to the trust.

As we noted recently in *City of Berkeley* v. *Superior Court, supra,* 26 Cal.3d 515, the decision of the United States Supreme Court in *Illinois Central Railroad Company* v. *Illinois, supra,* 146 U.S. 387, "remains the primary authority even today, almost nine decades after it was decided." (P. 521.) The Illinois Legislature in 1886 had granted the railroad in fee simple 1,000 acres of submerged lands, virtually the entire Chicago waterfront. Four years later it sought to revoke that grant. The Supreme Court upheld the revocatory legislation. Its opinion explained that lands under navigable waters conveyed to private parties for wharves, docks, and other structures in furtherance of trust purposes could be granted free of the trust because the conveyance is consistent with the purpose of the trust. But the legislature, it held, did not have the power to convey the entire city waterfront free of trust, thus barring all future legislatures from protecting the public interest. The opinion declares that: "A grant of all the lands under the navigable waters of a State has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, . . . than it can abdicate its police powers in the administration of government and the preservation of

---

[18]For review of California decisions on navigability, see Dunning, *op. cit. supra,* 14 U.C. Davis L.Rev. 357, 384-386.

[19]In view of the conclusion stated in the text, we need not consider the question whether the public trust extends for some purposes—such as protection of fishing, environmental values, and recreation interests—to nonnavigable streams. For discussion of this subject, see Walston, *The Public Trust Doctrine in the Water Rights Context: The Wrong Environmental Remedy* (1982) 22 Santa Clara L.Rev. 63, 85.

the peace. In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the State the right to revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes. So with trusts connected with public property, or property of a special character, like lands under navigable waterways, they cannot be placed entirely beyond the direction and control of the State." (Pp. 453-454 [36 L.Ed. pp. 1042-1043].)

Turning to the *Illinois Central* grant, the court stated that: "Any grant of the kind is necessarily revocable, and the exercise of the trust by which the property was held by the State can be resumed at any time. Undoubtedly there may be expenses incurred in improvements made under such a grant which the State ought to pay; but, be that as it may, the power to resume the trust whenever the State judges best is, we think, incontrovertible. . . . The ownership of the navigable waters of the harbor and of the lands under them is a subject of public concern to the whole people of the State. The trust with which they are held, therefore, is governmental and cannot be alienated, except in those instances mentioned of parcels used in the improvement of the interest thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining." (Pp. 455-456 [36 L.Ed. p. 1043].)

The California Supreme Court indorsed the *Illinois Central* principles in *People* v. *California Fish Co., supra,* 166 Cal. 576 [138 P. 79]. *California Fish* concerned title to about 80,000 acres of tidelands conveyed by state commissioners pursuant to statutory authorization. The court first set out principles to govern the interpretation of statutes conveying that property: "[S]tatutes purporting to authorize an abandonment of . . . public use will be carefully scanned to ascertain whether or not such was the legislative intention, and that intent must be clearly expressed or necessarily implied. It will not be implied if any other inference is reasonably possible. And if any interpretation of the statute is reasonably possible which would not involve a destruction of the public use or an intention to terminate it in violation of the trust, the courts will give the statute such interpretation." (*Id.,* at p. 597.) Applying these principles, the court held that because the statute in question and the grants pursuant thereto were not made for trust purposes, the grantees did not acquire absolute title; instead, the grantees "own the soil, subject to the easement of the public for the public uses of navigation and commerce, and to the right of the state, as administrator and controller of these public uses and the public trust therefor, to enter upon and possess the same for the preservation and advancement of the public uses and to make such changes and improvements as may be deemed advisable for those purposes." (*Id.,* at pp. 598-599.)

Finally, rejecting the claim of the tideland purchasers for compensation, the court stated they did not lose title, but retained it subject to the public trust. (See

pp. 599-601.) While the state may not "retake the absolute title without compensation" (p. 599), it may without such payment erect improvements to further navigation and take other actions to promote the public trust.[20]

*Boone* v. *Kingsbury* (1928) 206 Cal. 148 [273 P. 797], presents another aspect of this matter. The Legislature authorized the Surveyor-General to lease trust lands for oil drilling. Applying the principles of *Illinois Central,* the court upheld that statute on the ground that the derricks would not substantially interfere with the trust. ██ ██ ██ ██ Any licenses granted by the statute, moreover, remained subject to the trust: "The state may at any time remove [the] structures . . . , even though they have been erected with its license or consent, if it subsequently determines them to be purprestures or finds that they substantially interfere with navigation or commerce." (Pp. 192-193.)[21]

Finally, in our recent decision in *City of Berkeley* v. *Superior Court, supra,* 26 Cal.3d 515, we considered whether deeds executed by the Board of Tidelands Commissioners pursuant to an 1870 act conferred title free of the trust. Applying the principles of earlier decisions, we held that the grantees' title was subject to the trust, both because the Legislature had not made clear its intention to authorize a conveyance free of the trust and because the 1870 act and the conveyances under it were not intended to further trust purposes.

---

[20] In *Mallon* v. *City of Long Beach* (1955) 44 Cal.2d 199 [282 P.2d 481], the court held that revenues derived from the use of trust property ordinarily must be used for trust purposes. (Pp. 205-206.) (See also *City of Long Beach* v. *Morse* (1947) 31 Cal.2d 254 [188 P.2d 17]; *State of California* ex rel. *State Lands Com.* v. *County of Orange* (1982) 134 Cal.App.3d 20 [184 Cal.Rptr. 423].) The Legislature could abandon the trust over the proceeds, the court said, absent evidence that the abandonment would impair the power of future legislatures to protect and promote trust uses. (P. 207.) So long as the tidelands themselves remained subject to the trust, however, future legislatures would have the power to revoke the abandonment and reestablish a trust on the revenues. (*Ibid.*) (See *City of Coronado* v. *San Diego Unified Port District* (1964) 227 Cal.App.2d 455, 473-474 [38 Cal.Rptr. 834].)

[21] In *Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks., supra,* 67 Cal.2d 408, the state constructed a freeway bridge which partially impaired navigation in the Stockton Deep Water Ship Channel. Upstream shipyard owners, disclaiming any reliance on the public trust, filed suit for damages on a theory of inverse condemnation. The opinion stated that "the state, as trustee for the benefit of the people, has power to deal with its navigable waters in any manner consistent with the improvement of commercial intercourse, whether navigational or otherwise." (P. 419.) It then concluded that lands littoral to navigable waters are burdened by a navigational servitude in favor of the state and, absent an actual taking of those lands, the owners cannot claim damages when the state acts within its powers.

We agree with DWP and the state that *Colberg* demonstrates the power of the state, as administrator of the public trust, to prefer one trust use over another. We cannot agree, however, with DWP's further contention that *Colberg* proves the power of a state agency to abrogate the public trust merely by authorizing a use inconsistent with the trust. Not only did plaintiffs in *Colberg* deliberately decline to assert public trust rights, but the decision rests on the power of the state to promote one trust purpose (commerce) over another (navigation), not on any power to grant rights free of the trust. (See Dunning, *op. cit. supra,* 14 U.C. Davis L.Rev. 357, 382-288.)

Once again we rejected the claim that establishment of the public trust constituted a taking of property for which compensation was required: "We do not divest anyone of title to property; the consequence of our decision will be only that some landowners whose predecessors in interest acquired property under the 1870 act will, like the grantees in *California Fish,* hold it subject to the public trust." (P. 532.)[22]

■ In summary, the foregoing cases amply demonstrate the continuing power of the state as administrator of the public trust, a power which extends to the revocation of previously granted rights or to the enforcement of the trust against lands long thought free of the trust (see *City of Berkeley* v. *Superior Court, supra,* 26 Cal.3d 515). ■ Except for those rare instances in which a grantee may acquire a right to use former trust property free of trust restrictions, the grantee holds subject to the trust, and while he may assert a vested right to the servient estate (the right of use subject to the trust) and to any improvements he erects, he can claim no vested right to bar recognition of the trust or state action to carry out its purposes.

■ Since the public trust doctrine does not prevent the state from choosing between trust uses (*Colberg, Inc.* v. *State of California, supra,* 67 Cal.2d 408, 419; *County of Orange* v. *Heim* (1973) 30 Cal.App.3d 694, 707 [106 Cal.Rptr. 825]), the Attorney General of California, seeking to maximize state power under the trust, argues for a broad concept of trust uses. In his view, "trust uses" encompass all public uses, so that in practical effect the doctrine would impose no restrictions on the state's ability to allocate trust property. We know of no authority which supports this view of the public trust, except perhaps the dissenting opinion in *Illinois Central Railroad Co.* v. *Illinois, supra,* 146 U.S. 387. Most decisions and commentators assume that "trust uses" relate to uses and activities in the vicinity of the lake, stream, or tidal reach at issue (see e.g., *City of Los Angeles* v. *Aitken, supra,* 10 Cal.App.2d 460, 468-469; *State of Cal.* ex rel. *State Lands Com.* v. *County of Orange, supra,* 134 Cal.App.3d 20; Sax, *op. cit. supra,* 68 Mich.L.Rev. 471, 542). The tideland cases make this point clear; after *City of Berkeley* v. *Superior Court, supra,* 26 Cal.3d 515, no one could contend that the state could grant tidelands free of the trust merely because the grant served some public purpose, such as increasing tax revenues, or because the grantee might put the property to a commercial use.

---

[22]We noted, however, that "any improvements made on such lands could not be appropriated by the state without compensation." (Pp. 533-534, citing *Illinois Central Railroad Co.* v. *Illinois, supra,* 146 U.S. 387, 455 [36 L.Ed. 1018, 1043].)

In *State of California* v. *Superior Court (Fogerty), supra,* 29 Cal.3d 240, 249, we stated that owners of shoreline property in Lake Tahoe would be entitled to compensation if enforcement of the public trust required them to remove improvements. By implication, however, the determination that the property was subject to the trust, despite its implication as to future uses and improvements, was not considered a taking requiring compensation.

Thus, the public trust is more than an affirmation of state power to use public property for public purposes. It is an affirmation of the duty of the state to protect the people's common heritage of streams, lakes, marshlands and tidelands, surrendering that right of protection only in rare cases when the abandonment of that right is consistent with the purposes of the trust.

### 3. *The California Water Rights System.*

"It is laid down by our law writers, that the right of property in water is usufructuary, and consists not so much of the fluid itself as the advantage of its use." (*Eddy* v. *Simpson* (1853) 3 Cal. 249, 252.) Hence, the cases do not speak of the ownership of water, but only of the right to its use. (*Rancho Santa Margarita* v. *Vail* (1938) 11 Cal.2d 501, 554-555 [81 P.2d 533]; see generally Hutchins, The Cal. Law of Water Rights (1956) pp. 36-38; 1 Rogers & Nichols, Water for Cal. (1967) p. 191.) Accordingly, Water Code section 102 provides that "[a]ll water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law."

Our recent decision in *People* v. *Shirokow* (1980) 26 Cal.3d 301 [162 Cal.Rptr. 30, 605 P.2d 859], described the early history of the appropriative water rights system in California. We explained that "California operates under the so-called dual system of water rights which recognizes both the appropriation and the riparian doctrines. (Hutchins, The California Law of Water Rights, *supra,* at pp. 40, 55-67.) The riparian doctrine confers upon the owner of land contiguous to a watercourse the right to the reasonable and beneficial use of water on his land. The appropriation doctrine contemplates the diversion of water and applies to 'any taking of water for other than riparian or overlying uses.' (*City of Pasadena* v. *City of Alhambra* (1949) 33 Cal.2d 908, 925 [207 P.2d 17], and cases there cited.) . . .

". . . . . . . . . . . . . . . . . . . . . .

"Common law appropriation originated in the gold rush days when miners diverted water necessary to work their placer mining claims. The miners adopted among themselves the priority rule of 'first in time, first in right,' and California courts looked to principles of equity and of real property law to adjudicate conflicting claims. [Citations.] Thus it was initially the law in this state that a person could appropriate water merely by diverting it and putting it to use.

"The first appropriation statute was enacted in 1872 and provided for initiation of the appropriative right by the posting and recordation of notice. (Civ. Code, §§ 1410-1422.) The nonstatutory method retained its vitality and appropriative rights were acquired by following either procedure. [Citation.]

"Both methods were superseded by the 1913 enactment of the Water Commission Act, which created a Water Commission and provided a procedure for the appropriation of water for useful and beneficial purposes. The main purpose of the act was 'to provide an orderly method for the appropriation of [unappropriated] waters.' (*Temescal Water Co.* v. *Dept. Public Works* (1955) 44 Cal.2d 90, 95 [280 P.2d 1]; *Bloss* v. *Rahilly* (1940) 16 Cal.2d 70, 75 [104 P.2d 1049].) By amendment in 1923, the statutory procedure became the exclusive means of acquiring appropriative rights. (§ 1225, Stats. 1923, ch. 87.) The provisions of the Water Commission Act, as amended from time to time, have been codified in Water Code, divisions 1 and 2. (Stats. 1943, ch. 368.)" (Pp. 307-308, fns. omitted.)

The role of the Water Board under the 1913 act, as *Shirokow* indicated, was a very limited one. The only water subject to appropriation under the act was water which was not then being applied to useful and beneficial purposes, and was not otherwise appropriated. (See Wat. Code, § 1201, based upon Stats. 1913, ch. 586, § 11, p. 1017.) Thus, appropriative rights acquired under the act were inferior to preexisting rights such as riparian rights, pueblo rights, and prior prescriptive appropriations. (See *City of San Diego* v. *Cuyamaca Water Co.* (1930) 209 Cal. 105 [287 P. 475].)

Judical decisions confirmed this limited role. According to the courts, the function of the Water Board was restricted to determining if unappropriated water was available; if it was, and no competing appropriator submitted a claim, the grant of an appropriation was a ministerial act. (*Tulare Water Co.* v. *State Water Com.* (1921) 187 Cal. 533 [202 P. 874].)

In 1926, however, a decision of this court led to a constitutional amendment which radically altered water law in California and led to an expansion of the powers of the board. In *Herminghaus* v. *South. California Edison Co.* (1926) 200 Cal. 81 [252 P. 607], we held not only that riparian rights took priority over appropriations authorized by the Water Board, a point which had always been clear, but that as between the riparian and the appropriator, the former's use of water was not limited by the doctrine of reasonable use. (Pp. 100-101.) That decision led to a constitutional amendment which abolished the right of a riparian to devote water to unreasonable uses, and established the doctrine of reasonable use as an overriding feature of California water law. (See *Fullerton* v. *State Water Resources Control Bd.* (1979) 90 Cal.App.3d 590, 596 [153 Cal.Rptr. 518], and cases there cited..)

Article X, section 2 (enacted in 1928 as art. XIV, § 3) reads in pertinent part as follows: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. . . . This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

■ This amendment does more than merely overturn *Herminghaus*—it establishes state water policy. All uses of water, including public trust uses, must now conform to the standard of reasonable use. (See *Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351, 367 [40 P.2d 486]; *People* ex rel. *State Water Resources Control Bd.* v. *Forni* (1976) 54 Cal.App.3d 743, 749-750 [126 Cal.Rptr. 851].)[23]

The 1928 amendment did not declare whether the in-stream uses protected by the public trust could be considered reasonable and beneficial uses. In a 1936 case involving Mono Lake, however, the court squarely rejected DWP's argument that use of stream water to maintain the lake's scenic and recreational values violated the constitutional provision barring unreasonable uses. (*County of Los Angeles* v. *Aitken, supra,* 10 Cal.App.2d 460.) The point is now settled by statute, Water Code section 1243 providing that "[t]he use of water for recreation and preservation and enhancement of fish and wildlife resources is a beneficial use of water." (See also *California Trout, Inc.* v. *State Water Resources Control Bd.* (1979) 90 Cal.App.3d 816, 821 [153 Cal.Rptr. 672].)

The 1928 amendment itself did not expand the authority of the Water Board. The board remained, under controlling judicial decisions, a ministerial body with the limited task of determining priorities between claimants seeking to appropriate unclaimed water. More recent statutory and judicial developments, however, have greatly enhanced the power of the Water Board to oversee the

---

[23]After the effective date of the 1928 amendment, no one can acquire a vested right to the unreasonable use of water. (See *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 145 [60 Cal.Rptr. 377, 429 P.2d 889]; 1 Rogers & Nichols, *op. cit. supra,* p. 413 and cases there cited.)

reasonable use of water and, in the process, made clear its authority to weigh and protect public trust values.

In 1955, the Legislature declared that in acting on appropriative applications, "the board shall consider the relative benefit to be derived from (1) all beneficial uses of the water concerned including, but not limited to, use for domestic, irrigation, municipal, industrial, preservation and enhancement of fish and wildlife, recreational, mining and power purposes . . . . The board may subject such appropriations to such terms and conditions as in its judgment will best develop, conserve, and utilize in the public interest, the water sought to be appropriated." (Wat. Code, § 1257.) In 1959 it stated that "[t]he use of water for recreation and preservation and enhancement of fish and wildlife resources is a beneficial use of water." (Wat. Code, § 1243.) Finally in 1969 the Legislature instructed that "[i]n determining the amount of water available for appropriation, the board shall take into account, whenever it is in the public interest, the amounts of water needed to remain in the source for protection of beneficial uses." (Wat. Code, § 1243.5.)

Judicial decisions have also expanded the powers of the Water Board. In *Temescal Water Co.* v. *Dept. Public Works* (1955) 44 Cal.2d 90 [280 P.2d 1], we rejected the holding of *Tulare Water Co.* v. *State Water Com.*, *supra*, 187 Cal. 533, and held that the decision of the board to grant an application to appropriate water was a quasi-judicial decision, not a ministerial act. In *People* v. *Shirokow*, *supra*, 26 Cal.3d 301, we held that the board could enjoin diversion of water by the owner of a prescriptive right who refused to comply with water conservation programs, even though his right was not based on a board license. Our decision rested on the legislative intent "to vest in the board expansive powers to safeguard the scarce water resources of the state." (P. 309; see also *Environmental Defense Fund, Inc.* v. *East Bay Mun. Utility Dist.*, *supra*, 26 Cal.3d 183, 194-195; *In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339 [158 Cal.Rptr. 350, 599 P.2d 656].) Although the courts have refused to allow the board to appropriate water for in-stream uses, even those decisions have declared that the board has the power and duty to protect such uses by withholding water from appropriation. (*Fullerton* v. *State Water Resources Control Bd.*, *supra*, 90 Cal.App.3d 590, 603-604; *California Trout, Inc.* v. *State Water Resources Control Bd.*, *supra*, 90 Cal.App.3d 816, 821.)

Thus, the function of the Water Board has steadily evolved from the narrow role of deciding priorities between competing appropriators to the charge of comprehensive planning and allocation of waters. This change necessarily affects the board's responsibility with respect to the public trust. The board of limited powers of 1913 had neither the power nor duty to consider interests protected by the public trust; the present board, in undertaking planning and allocation of water resources, is required by statute to take those interests into account.

4. *The relationship between the Public Trust Doctrine and the California Water Rights System.*

As we have seen, the public trust doctrine and the appropriative water rights system administered by the Water Board developed independently of each other. Each developed comprehensive rules and principles which, if applied to the full extent of their scope, would occupy the field of allocation of stream waters to the exclusion of any competing system of legal thought. Plaintiffs, for example, argue that the public trust is antecedent to and thus limits all appropriative water rights, an argument which implies that most appropriative water rights in California were acquired and are presently being used unlawfully.[24] Defendant DWP, on the other hand, argues that the public trust doctrine as to stream waters has been "subsumed" into the appropriative water rights system and, absorbed by that body of law, quietly disappeared; according to DWP, the recipient of a board license enjoys a vested right in perpetuity to take water without concern for the consequences to the trust.

We are unable to accept either position. In our opinion, both the public trust doctrine and the water rights system embody important precepts which make the law more responsive to the diverse needs and interests involved in the planning and allocation of water resources. To embrace one system of thought and reject the other would lead to an unbalanced structure, one which would either decry as a breach of trust appropriations essential to the economic development of this state, or deny any duty to protect or even consider the values promoted by the public trust. Therefore, seeking an accommodation which will make use of the pertinent principles of both the public trust doctrine and the appropriative water rights system, and drawing upon the history of the public trust and the water rights system, the body of judicial precedent, and the views of expert commentators, we reach the following conclusions:

a. The state as sovereign retains continuing supervisory control over its navigable waters and the lands beneath those waters. This principle, fundamental to the concept of the public trust, applies to rights in flowing waters as well as to rights in tidelands and lakeshores; it prevents any party from acquiring a vested right to appropriate water in a manner harmful to the interests protected by the public trust.[25]

---

[24]Plaintiffs suggest that appropriative rights expressly conferred by the Legislature would not be limited by the public trust doctrine. The Attorney General informs us, however, that the Legislature has rarely created water rights by express legislation, but instead has delegated that task to the Water Board.

[25]As we discussed earlier (*ante,* p. 440), there are rare exceptions to the rule stated in the text. It is unlikely that these exceptions will often apply to usufructuary water rights. (See discussion in Johnson, *op. cit. supra,* 14 U.C. Davis L.Rev. 233, 263-264.)

■ b. As a matter of current and historical necessity, the Legislature, acting directly or through an authorized agency such as the Water Board, has the power to grant usufructuary licenses that will permit an appropriator to take water from flowing streams and use that water in a distant part of the state, even though this taking does not promote, and may unavoidably harm, the trust uses at the source stream. The population and economy of this state depend upon the appropriation of vast quantities of water for uses unrelated to in-stream trust values.[26] California's Constitution (see art. X, § 2), its statutes (see Wat. Code, §§ 100, 104), decisions (see, e.g., *Waterford I. Dist.* v. *Turlock I. Dist.* (1920) 50 Cal.App. 213, 220 [194 P. 757]), and commentators (e.g., Hutchins, The Cal. Law of Water Rights, *op. cit. supra,* p. 11) all emphasize the need to make efficient use of California's limited water resources: all recognize, at least implicitly, that efficient use requires diverting water from in-stream uses. Now that the economy and population centers of this state have developed in reliance upon appropriated water, it would be disingenuous to hold that such appropriations are and have always been improper to the extent that they harm public trust uses, and can be justified only upon theories of reliance or estoppel.

■ c. The state has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible.[27] Just as the history of this state shows that appropriation may be necessary for efficient use of water despite unavoidable harm to public trust values, it demonstrates that an appropriative water rights system administered without consideration of the public trust may cause unnecessary and unjustified harm to trust interests. (See Johnson, *op. cit. supra,* 14 U.C. Davis L.Rev. 233, 256-257; Robie, *Some Reflections on Environmental Considerations in Water Rights Administration* (1972) 2 Ecology L.Q. 695, 710-711; Comment, *op. cit. supra,* 33 Hastings L.J. 653, 654.) As a matter of practical necessity the state may have to approve appropriations despite foreseeable harm to public trust uses. In so doing, however, the state must bear in mind its duty as trustee to consider the effect of the taking on the public trust (see *United Plainsmen* v. *N.D. State Water Cons. Commission* (N.D. 1976)

---

[26]In contrast, the population and economy of this state does *not* depend on the conveyance of vast expanses of tidelands or other property underlying navigable waters. (See Comment, *The Public Trust Doctrine and California Water Law: National Audubon Society* v. *Dept. of Water and Power* (1982) 33 Hastings L.J. 653, 668.) Our opinion does not affect the restrictions imposed by the public trust doctrine upon transfer of such properties free of the trust.

[27]Amendments to the Water Code enacted in 1955 and subsequent years codify in part the duty of the Water Board to consider public trust uses of stream water. (See, *ante,* at p. 444.) The requirements of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) impose a similar obligation. (See Robie, *op. cit. supra,* 2 Ecology L.Q. 695.)

These enactments do not render the judicially fashioned public trust doctrine superfluous. Aside from the possibility that statutory protections can be repealed, the noncodified public trust doctrine remains important both to confirm the state's sovereign supervision and to require consideration of public trust uses in cases filed directly in the courts without prior proceedings before the board.

247 N.W.2d 457, 462-463), and to preserve, so far as consistent with the public interest, the uses protected by the trust.

Once the state has approved an appropriation, the public trust imposes a duty of continuing supervision over the taking and use of the appropriated water. In exercising its sovereign power to allocate water resources in the public interest, the state is not confined by past allocation decisions which may be incorrect in light of current knowledge or inconsistent with current needs.

The state accordingly has the power to reconsider allocation decisions even though those decisions were made after due consideration of their effect on the public trust.[28] The case for reconsidering a particular decision, however, is even stronger when that decision failed to weigh and consider public trust uses. In the case before us, the salient fact is that no responsible body has ever determined the impact of diverting the entire flow of the Mono Lake tributaries into the Los Angeles Aqueduct. This is not a case in which the Legislature, the Water Board, or any judicial body has determined that the needs of Los Angeles outweigh the needs of the Mono Basin, that the benefit gained is worth the price. Neither has any responsible body determined whether some lesser taking would better balance the diverse interests.[29] Instead, DWP acquired rights to the entire flow in 1940 from a water board which believed it lacked both the power and the duty to protect the Mono Lake environment, and continues to exercise those rights in apparent disregard for the resulting damage to the scenery, ecology, and human uses of Mono Lake.

It is clear that some responsible body ought to reconsider the allocation of the waters of the Mono Basin.[30] No vested rights bar such reconsideration. We

[28]The state Attorney General asserts that the Water Board could also reconsider the DWP water rights under the doctrine of unreasonable use under article X, section 2. DWP maintains, however, that its use of the water for domestic consumption is prima facie reasonable. The dispute centers on the test of unreasonable use—does it refer only to inordinate and wasteful use of water, as in *Peabody* v. *City of Vallejo, supra,* 2. Cal.2d 351, or to any use less than the optimum allocation of water? (On this question, see generally *Joslin* v. *Marin Mun. Water Dist., supra,* 67 Cal.2d 132, 138-141.) In view of our reliance on the public trust doctrine as a basis for reconsideration of DWP's usufructuary rights, we need not resolve that controversy.

[29]The one objective study which has been done to date, the Report of the Interagency Task Force on Mono Lake recommended a sharp curtailment in the diversion of water by the DWP. (See Task Force Report at pp. 36-40.) The task force, however, had only the authority to make recommendations, and lacked power to adjudicate disputed issues of fact or law or to allocate water.

[30]In approving the DWP appropriative claim, the 1940 Water Board relied on Water Code section 106 which states that "[i]t is hereby declared to be the established policy of this State that the use of water for domestic purposes is the highest use of water and that the next highest use is for irrigation." DWP points to this section, and to a 1945 enactment which declares a policy of protecting municipal water rights (Wat. Code, § 106.5), and inquires into the role of these policy declarations in any reconsideration of DWP's rights in the Mono Lake tributaries.

Although the primary function of these provisions, particularly section 106, is to establish priorities between competing appropriators, these enactments also declare principles of Califor-

recognize the substantial concerns voiced by Los Angeles—the city's need for water, its reliance upon the 1940 board decision, the cost both in terms of money and environmental impact of obtaining water elsewhere. Such concerns must enter into any allocation decision. We hold only that they do not preclude a reconsideration and reallocation which also takes into account the impact of water diversion on the Mono Lake environment.

### 5. *Exhaustion of Administrative Remedies.*

On motion for summary judgment, the trial court held that plaintiffs must exhaust their administrative remedies before the Water Board prior to filing suit in superior court. Plaintiffs, supported on this point by DWP, contend that the courts and the board have concurrent jurisdiction over the merits of their claim, and thus that they had no duty to exhaust any administrative remedy before filing suit.

The first question we must face is whether plaintiffs had any Water Board remedy to exhaust. There appear to be two possible grounds upon which plaintiffs could initiate a board proceeding. First, they could claim that DWP was making an unreasonable use of water, in violation either of controlling constitutional and statutory provisions or of the terms of DWP's license. (See Cal. Admin. Code, tit. 23, § 764.10.) Plaintiffs, however, expressly disclaim any intent to charge unreasonable use, and announced instead their intent to found their action solely on the public trust doctrine, so this remedy is unavailable.

The only alternative method of bringing the issue before the board is a proceeding invoking Water Code section 2501, which provides that "[t]he board may determine, in the proceedings provided for in this chapter, all rights to water of a stream system whether based upon appropriation, riparian right, or other basis of right." We recognize certain difficulties in applying this remedy to the present case. It is unclear whether a claim based on the public trust is a "water right" in the technical sense of that term. (See Dunning, *op. cit. supra,* 14 U.C. Davis L.Rev. 357, 383; cf. *Fullerton v. State Water Resources Control Bd., supra,* 90 Cal.App.3d 590, 604.) Also, the relevant chapter of the Water Code refers to petitions filed by "claimants to water" (see, e.g., Wat. Code, § 2525); it is uncertain whether a person asserting the interest of the public trust would be considered a "claimant."

---

nia water policy applicable to any allocation of water resources. In the latter context, however, these policy declarations must be read in conjunction with later enactments requiring consideration of in-stream uses (Wat. Code, §§ 1243, 1257, quoted *ante* at pp. 443-444) and judicial decisions explaining the policy embodied in the public trust doctrine. Thus, neither domestic and municipal uses nor in-stream uses can claim an absolute priority.

In recent decisions, however, we have discerned a legislative intent to grant the Water Board a "broad," "open-ended," "expansive" authority to undertake comprehensive planning and allocation of water resources. (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 348-349, 350, fn. 5 [158 Cal.Rptr. 350, 599 P.2d 656]; *People* v. *Shirokow, supra,* 26 Cal.3d 301, 309.) Both cases emphasized the board's power to adjudicate *all* competing claims, even riparian claims (*Long Beach*) and prescriptive claims (*Shirokow*) which do not fall within the appropriative licensing system. Having construed section 2501 to give the board broad substantive powers—powers adequate to carry out the legislative mandate of comprehensive protection of water resources—it would be inconsistent to read that statute so narrowly that the board lacked jurisdiction to employ those powers.

We therefore construe Water Code section 2501 to permit a person claiming that a use of water is harmful to interests protected by the public trust to seek a board determination of the allocation of water in a stream system, a determination which may include reconsideration of rights previously granted in that system. Under this interpretation of section 2501, plaintiffs have a remedy before the Water Board.

 Must plaintiffs exhaust this administrative remedy before filing suit in superior court? A long line of decisions indicates that remedies before the Water Board are not exclusive, but that the courts have concurrent original jurisdiction.

As we observed earlier in this opinion (see *ante,* pp. 442-443), for much of its history the Water Board was an agency of limited scope and power. Many water right disputes, such as those involving riparian rights, pueblo rights, and prescriptive rights, did not fall within the jurisdiction of the board. But even in cases which arguably came within the board's limited jurisdiction, the parties often filed directly in the superior court, which assumed jurisdiction and decided the case. (See, e.g., *Allen* v. *California Water & Tel. Co.* (1946) 29 Cal.2d 466 [176 P.2d 8].) All public trust cases cited in this opinion were filed directly in the courts. Thus, a 1967 treatise on California water law could conclude that "[g]enerally, the superior courts of California have original jurisdiction over water rights controversies . . ." but in some cases must share concurrent jurisdiction with administrative bodies. (1 Rogers & Nichols, *op. cit. supra,* at p. 528.)

Although prior cases had assumed jurisdictional concurrency, we first discussed that question in our decision in *Environmental Defense Fund, Inc.* v. *Easy Bay Mun. Utility Dist.* (1977) 20 Cal.3d 327 [142 Cal.Rptr. 904, 572 P.2d 1128] (*EDF I*), and our later decision in the same case on remand from the United States Supreme Court, *Environmental Defense Fund, Inc.* v. *East Bay*

*Mun. Utility Dist., supra,* 26 Cal.3d 183 (*EDF II*). Plaintiff in that case sued to enjoin performance of a contract for diversion of water from the American River on the ground that under the doctrine of reasonable use the utility district should instead use reclaimed waste water. Intervener County of Sacramento claimed the diversion was an unreasonable use because the diversion point was too far upstream, and would deprive downstream users of the water.

In *EDF I* we held that the Legislature had intended to vest regulation of waste water reclamation in the Water Board because of the need for expert evaluation of the health and feasibility problems involved. We therefore concluded that the plaintiffs' superior court action to compel waste water reclamation was barred by failure to exhaust administrative remedies. (20 Cal.3d 327, 343-344.)

*EDF I* further held the intervener's claim concerning the diversion point was barred by federal preemption (p. 340), but the United States Supreme Court vacated our decision and remanded for reconsideration in light of *California* v. *United States* (1978) 438 U.S. 645 [57 L.Ed.2d 1018, 98 S.Ct. 2985]. On remand, we found no federal preemption, and further held that intervener's claim was not defeated by failure to exhaust administrative remedies. Noting that "the courts [had] traditionally exercised jurisdiction of claims of unreasonable water use" (*EDF II,* 26 Cal.3d 183, 199), we stated that "[a]part from overriding considerations such as are presented by health and safety dangers involved in the reclamation of waste water, we are satisfied that the courts have concurrent jurisdiction with . . . administrative agencies to enforce the self-executing provisions of article X, section 2." (P. 200.)[31]

The present case involves the same considerations as those before us in the *EDF* cases. On the one hand, we have the board with experience and expert knowledge, not only in the intricacies of water law but in the economic and engineering problems involved in implementing water policy.[32] The board, moreover, is charged with a duty of comprehensive planning, a function difficult to perform if some cases bypass board jurisdiction. On the other hand, we

[31]This case does not fall within the exception established in *EDF II* granting the board exclusive jurisdiction over reclamation of waste waters and other matters involving a potential danger to public health. (See *EDF II,* pp. 199-200.) The issues involving Mono Lake are complex, and because the emerging lakebed may contribute to dust storms, the case includes a public health aspect. Nevertheless, those issues are more analogous to those typically decided by the courts under their concurrent jurisdiction (such as the claim of intervener in *EDF II* that the diversion point of water was too far upstream) than they are to the narrow and specialized problem of reclaiming waste water. If we read the exception in *EDF II* so broadly that any complex case with tangential effect on public health came within the board's exclusive jurisdiction, that exception would consume the rule of concurrent jurisdiction.

[32]We noted in *EDF I* that "[t]he scope and technical complexity of issues concerning water resource management are unequalled by virtually any other type of activity presented to the courts." (*EDF I, supra,* 20 Cal.3d 327, 344.)

have an established line of authority declaring the concurrent jurisdiction of the courts, and reliance upon that authority by the plaintiffs.

We have seriously considered whether, in light of the broad powers and duties which the Legislature has conferred on the Water Board, we should overrule *EDF II* and declare that henceforth the board has exclusive primary jurisdiction in matters falling within its purview. We perceive, however, that the Legislature has chosen an alternative means of reconciling board expertise and judicial precedent. Instead of granting the board exclusive primary jurisdiction, it has enacted a series of statutes designed to permit state courts, and even federal courts, to make use of the experience and expert knowledge of the board.

Water Code section 2000 provides that "[i]n any suit brought in any court of competent jurisdiction in this State for determination of rights to water, the court may order a reference to the board, as referee, of any or all issues involved in the suit." Section 2001 provides alternatively that the court "may refer the suit to the board for investigation of and report upon any or all of the physical facts involved." Finally, recognizing that some water cases will be filed in or transferred to federal courts, section 2075 provides that "[i]n case suit is brought in a federal court for determination of the rights to water within, or partially within, this State, the board may accept a reference of such suit as master or referee for the court."

These statutes necessarily imply that the superior court has concurrent original jurisdiction in suits to determine water rights, for a reference to the board as referee or master would rarely if ever be appropriate in a case filed originally with the board. The court, however, need not proceed in ignorance, nor need it invest the time required to acquire the skills and knowledge the board already possesses. When the case raises issues which should be considered by the board, the court may refer the case to the board. Thus the courts, through the exercise of sound discretion and the use of their reference powers, can substantially eliminate the danger that litigation will bypass the board's expert knowledge and frustrate its duty of comprehensive planning.[33]

---

[33]The state Attorney General argues that even though the courts generally possess concurrent jurisdiction in water cases, the board should have exclusive jurisdiction over actions attacking a board-granted water right. In view of the reference power of the courts, we think this exception unnecessary. The court presently has the power to refer such cases to the board whenever reference is appropriate; a rule of exclusive jurisdiction, requiring all such cases to be initiated before the board, would not significantly improve the fairness or efficiency of the process. In some cases, including the present one, it would lead to unproductive controversy over whether the plaintiff is challenging a right granted by the board or merely asserting an alleged right of higher priority.

6. *Conclusion.*

This has been a long and involved answer to the two questions posed by the federal district court. In summarizing our opinion, we will essay a shorter version of our response.

The federal court inquired first of the interrelationship between the public trust doctrine and the California water rights system, asking whether the "public trust doctrine in this context [is] subsumed in the California water rights system, or . . . function[s] independently of that system?" Our answer is "neither." The public trust doctrine and the appropriative water rights system are parts of an integrated system of water law. The public trust doctrine serves the function in that integrated system of preserving the continuing sovereign power of the state to protect public trust uses, a power which precludes anyone from acquiring a vested right to harm the public trust, and imposes a continuing duty on the state to take such uses into account in allocating water resources.

Restating its question, the federal court asked: "[C]an the plaintiffs challenge the Department's permits and licenses by arguing that those permits and licenses are limited by the public trust doctrine, or must the plaintiffs . . . [argue] that the water diversions and uses authorized thereunder are not 'reasonable or beneficial' as required under the California water rights system?" We reply that plaintiffs can rely on the public trust doctrine in seeking reconsideration of the allocation of the waters of the Mono Basin.

The federal court's second question asked whether plaintiffs must exhaust an administrative remedy before filing suit. Our response is "no." The courts and the Water Board have concurrent jurisdiction in cases of this kind. If the nature or complexity of the issues indicate that an initial determination by the board is appropriate, the courts may refer the matter to the board.

This opinion is but one step in the eventual resolution of the Mono Lake controversy. We do not dictate any particular allocation of water. Our objective is to resolve a legal conundrum in which two competing systems of thought—the public trust doctrine and the appropriative water rights system—existed independently of each other, espousing principles which seemingly suggested opposite results. We hope by integrating these two doctrines to clear away the legal barriers which have so far prevented either the Water Board or the courts from taking a new and objective look at the water resources of the Mono Basin. The human and environmental uses of Mono Lake—uses protected by the public trust doctrine—deserve to be taken into account. Such uses should not be destroyed because the state mistakenly thought itself powerless to protect them.

Let a peremptory writ of mandate issue commanding the Superior Court of Alpine County to vacate its judgment in this action and to enter a new judgment consistent with the views stated in this opinion.[34]

Bird, C. J., Mosk, J., Kaus, J., and Reynoso, J., concurred.

**KAUS, J.**—I concur in the court's opinion. While I share Justice Richardson's reservations on the issue of concurrent jurisdiction, I doubt that the problem can be solved by making the question of exclusive board jurisdiction depend on such rather vague tests as those announced in *EDF I* and *EDF II.* If a majority of the court were inclined to reconsider the issue, I would respectfully suggest that the exclusive jurisdiction of the board should be broadened to include disputes such as the present one. This would, obviously, involve the overruling of certain precedents on which plaintiffs justifiably relied. The new rule should, therefore, not be applicable to them.

Since, however, the requisite majority interest in reconsidering the question of concurrent jurisdiction is lacking, I join the court's opinion.

**RICHARDSON, J.**—I concur with parts 1 through 4 of the majority opinion and with its analysis of the relationship between the public trust doctrine and the water rights system in this state. I respectfully dissent, however, from part 5 of the opinion wherein the majority holds that the courts and the California Water Resources Board (Water Board) have *concurrent* jurisdiction in cases of this kind. In my view, there are several compelling reasons for holding that the Water Board has exclusive original jurisdiction over the present dispute, subject of course to judicial review of its decision.

As the majority recognizes, the matter of concurrent jurisdiction involves the related issue of exhaustion of administrative remedies. It is well settled that where an administrative remedy is provided by statute, that remedy must be pursued and exhausted before the courts will act. (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942, 132 A.L.R. 715].) This doctrine applies to disputes regarding water appropriated pursuant to permits issued by the Water Board. (*Temescal Water Co.* v. *Dept. Public Works* (1955) 44 Cal.2d 90, 106 [280 P.2d 1].) The majority concedes that plaintiffs had an administrative remedy available to them in the present case, namely, a proceeding under Water Code section 2501 "to seek a board determination of the allocation of water in a stream system," including "reconsideration of rights previously granted in that system." (*Ante,* p. 450.) Nevertheless, the majority

---

[34]The superior court should determine whether plaintiffs are entitled to attorney fees under Code of Civil Procedure section 1021.5 and *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 938-940 [154 Cal.Rptr. 503, 593 P.2d 200].

concludes that prior cases of this court, together with certain statutory provisions *permitting* (but not requiring) reference of water disputes to the Water Board, both excuse plaintiffs' failure to exhaust their administrative remedy and allow the courts to exercise concurrent jurisdiction in cases of this kind. I reach a contrary conclusion.

As the majority explains (*ante,* p. 450), earlier cases which held that the court shared concurrent jurisdiction with the Water Board were decided at a time when the board "was an agency of limited scope and power," without authority to consider many water right issues such as the application of the public trust. Indeed, the Water Board in the present case itself had assumed that it lacked jurisdiction over public trust issues; the board's 1940 decision granting appropriative permits reflects that assumption. (*Ante,* pp. 427-428.) If, as the majority now holds, the Water Board's jurisdiction extends to public trust issues, it is entirely proper to apply the exhaustion of remedies principle and insist that plaintiffs seek reconsideration from the board before litigating the matter in court.

The majority relies primarily upon *Environmental Defense Fund, Inc.* v. *East Bay Mun. Utility Dist.* (1980) 26 Cal.3d 183, 198-200 [161 Cal.Rptr. 466, 605 P.2d 1] (*EDF II*), but our language in that case supports the view that, in cases of the kind now before us, the board has exclusive jurisdiction. In *EDF II,* we held that "Apart from overriding considerations," the courts have concurrent jurisdiction with the Water Board to enforce the self-executing constitutional proscriptions against unreasonable water use and diversion. (P. 200.) Most of the "overriding considerations" referred to in *EDF II* are present here.

Thus, in that case we observed that waste water reclamation disputes require consideration of such complex and "transcendent" factors as the potential danger to public health and safety and the feasibility of reclamation, factors which would require deference to "appropriate administrative agencies," such as the Water Board, and would foreclose concurrent court jurisdiction. (P. 199; see also *Environmental Defense Fund, Inc.* v. *East Bay Mun. Utility Dist.* (1977) 20 Cal.3d 327, 343-344 [142 Cal.Rptr. 904, 572 P.2d 1128] (*EDF I*).) We repeated our earlier observation that "private judicial litigation involves piecemeal adjudication determining only the relative rights of the parties before the court, whereas in administrative proceedings comprehensive adjudication considers the interests of other concerned persons who may not be parties to the court action." (*EDF II,* at p. 199; see *In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 359-360 [158 Cal.Rptr. 350, 599 P.2d 656].)

The same "overriding considerations" catalogued by us in *EDF II* seem applicable here. Although this case does not involve waste water reclamation, nevertheless the balancing of public trust values affecting Mono Lake and the

water rights of a large metropolitan community presents similarly complex, overriding and "transcendent" issues which demand initial consideration by the Water Board. Only the board, which had issued the very licenses and permits now under challenge, possesses the experience and expertise needed to balance all of the various competing interests in reaching a fair and reasonable resolution of this vastly important litigation.

As we noted in *EDF I,* "The scope and technical complexity of issues concerning water resource management are unequalled by virtually any other type of activity presented to the courts." (20 Cal.3d at p. 344.) As the majority opinion herein amply demonstrates, similar complexities are presented here. The majority concedes that (1) "The present case involves the same considerations as those before us in the *EDF* cases," (2) the Water Board possesses the expertise to resolve "the intricacies of water law" and "the economic and engineering problems involved in implementing water policy," and (3) the board "is charged with a duty of comprehensive planning, a function difficult to perform if some cases bypass board jurisdiction." (*Ante,* p. 450.) Thus, the case for exclusive board jurisdiction seems to me truly overwhelming.

The majority's suggestion that various statutory provisions contemplate the exercise of concurrent jurisdiction in cases of this kind is unconvincing. These provisions (Wat. Code, §§ 2000, 2001, 2075) merely authorize the courts in water rights cases to refer the issues to the Water Board for its determination as a referee. Obviously, these provisions do not purport to excuse a prior failure to exhaust available administrative remedies before the Water Board. Moreover, these provisions do not attempt to resolve the question, presented in the *EDF* cases, whether "overriding considerations" dictate an exception to the general rule of concurrent jurisdiction.

As we said in *EDF I,* "When . . . the statutory pattern regulating a subject matter integrates the administrative agency into the regulatory scheme and the subject of the litigation demands a high level of expertise within the agency's special competence, we are satisfied that the litigation in the first instance must be addressed to the agency. [Citation.]" (20 Cal.3d at p. 344.) That principle seems fully applicable here.

I would affirm the judgment.

The petitions of real parties in interest State Lands Commission, State of California and State Water Resources Control Board for a rehearing were denied April 14, 1983, and the opinion was modified to read as printed above. Richardson, J., was of the opinion that the petitions should be granted.