[Nos. E004366, E004199. Fourth Dist., Div. Two. Jan. 20, 1989.]

BIG BEAR MUNICIPAL WATER DISTRICT, Plaintiff and Appellant, v.
BEAR VALLEY MUTUAL WATER COMPANY, Defendant and Respondent;
CITY OF REDLANDS, Intervener and Respondent.

**COUNSEL**

Downey, Brand, Seymour & Rohwer, Thomas N. Cooper, Anne J. Schneider, Kevin M. O'Brien and Martha H. Lennihan for Plaintiff and Appellant.

Reid & Hellyer and David G. Moore for Defendant and Respondent.

Best, Best & Krieger, Gregory K. Wilkinson and Eric L. Garner for Intervener and Respondent.

**OPINION**

**McDANIEL, Acting P. J.**—In an action initiated over 20 years ago by the Big Bear Municipal Water District (the District) against Bear Valley Mutual Water Company (Mutual) concerning the parties' respective rights to the water in Big Bear Lake, the District has appealed from an order denying its motion to interpret and to *modify* a judgment which was entered in the action in 1977, and which provided that the court retained jurisdiction to make whatever orders were necessary to interpret, *enforce,* or *carry out* the judgment. In addition, the City of Redlands (Redlands), which, as a shareholder of Mutual, had intervened in the current proceeding, has appealed from a second and later order which denied its motion for attorney's fees. The District has also cross-appealed from another provision of that second order which granted the motions of Mutual and of North Fork Water

Company, another defendant in the District's action, for their attorney's fees. The appeals have been consolidated.

## I

### BACKGROUND

#### A. *Events Preceding the 1977 Judgment*

In 1911, Bear Valley Dam (the dam) was built at the downstream end of Bear Valley. The dam created a reservoir known as Big Bear Lake (the lake), which covers nearly 3,000 acres at spillway level and has a capacity of 73,320 acre feet. The lake was and continues to be used for wildlife and recreational purposes as well as supplying water for domestic and agricultural uses, as originally contemplated when the dam was built.

When the lake was created, rights to the impounded water were owned by Mutual, which had been formed eight years earlier in 1903.[1] Mutual supplies water from the lake to North Fork Water Company and to Redlands, two of Mutual's shareholders, through Bear Creek, a tributary which runs from the lake to the Santa Ana River (the river). When Bear Creek reaches the river its waters are diverted in part to Mutual's diversion box, where they are then further diverted to the North Fork Canal and finally to the Redlands Canal. North Fork and Redlands have used Mutual's water almost exclusively for irrigation purposes; historically Redlands had never used the water for its domestic water supply.

In the mid-1960's the people who lived in the communities around the lake became concerned about the lowering of the water level of the lake resulting from Mutual's demands on the lake's impounded waters. To address this concern the District was created.

In 1965 the District filed an action against Mutual seeking to condemn Mutual's rights in the lake. In 1975 the District filed a second action against Mutual, the Prior Rights Companies (see fn. 1, *ante*), San Bernardino Valley Water Conservation District, and Southern California Edison Company, seeking a physical solution to the problems created by Mutual's use of impounded waters in the lake. The actions were joined and resulted in the District's purchase of the dam and the lake from Mutual, subject to the District's responsibility to deliver waters from the lake or otherwise to Mutual. That responsibility (the physical solution) was outlined in detail in

---

[1] Mutual's ownership rights were nevertheless subject to the prior rights of North Fork Water Company, Lugonia Water Company, and Redlands Water Company, known as the "Prior Rights Companies."

the 1977 judgment, which was agreed to by the parties after it had been drafted by the District.

### B.  *The 1977 Judgment*

The 1977 judgment is divided into six general sections: I. DEFINITIONS AND EXHIBITS; II. DECLARATIONS; III. INJUNCTIONS; IV. CONTINUING JURISDICTION; V. WATERMASTER (a committee appointed by the court to administer the provisions of the judgment); and VI. PHYSICAL SOLUTION. The following specific recitations are relevant to this appeal:

"II. DECLARATIONS. . . .

". . . . . . . . . . . . . . . . . .

"B. DECLARATION OF RIGHTS

". . . . . . . . . . . . . . . . . .

"7. *Mutual.* Mutual is the owner of an appropriative right, with the priorities of 1883 and 1909, to divert at [Bear Valley] Dam and store in [Big Bear] Lake for subsequent release and beneficial use within Mutual's service area of all of the flow of Bear Creek at the Dam and Lake. Said diversion shall be at such rate as may be reasonably necessary to meet the requirements of Mutual's stockholders, not exceeding 65,000 acre feet in any ten (10) year period. . . . Said rights have become prescriptive in nature as to all water right claimants downstream from the Dam, excepting only the rights of Prior Right Companies.

". . . . . . . . . . . . . . . . . .

"11. *District.* District owns the Dam and the reservoir behind it, subject to the right of Mutual to store water in the Lake, pursuant to its appropriative right. . . .

"III. INJUNCTIONS

"12. *Against District.* District, its officers, agents and employees are hereby ENJOINED AND RESTRAINED from interfering with the release of water from the Lake to meet the requirements of Mutual, except in compliance with the physical solution hereinafter decreed.

"IV. CONTINUING JURISDICTION

"13. *Continuing Jurisdiction.* Full jurisdiction, power and authority are retained and reserved to the Court for the purpose of enabling the Court, upon application of any party by motion and upon 30 days' notice hereof, and after hearing thereon, to make such further and supplemental orders or directions as may be necessary or appropriate for *interpretation, enforcement or carrying out* this Judgment. The Court may award attorneys' fees to the prevailing *party* in any further proceedings, pursuant to this paragraph. [Italics added.]

". . . . . . . . . . . . . . . . . . .

"VI. PHYSICAL SOLUTION

"23. *Need for Physical Solution.* There exists a need for additional water for recreational and wildlife enhancement purposes within District. There is not an economically feasible source of supplemental water available to meet the needs of District and its inhabitants for such purposes. . . .

"24. *General Plan of Operation.* In general terms, the physical solution hereafter decreed will provide for retention of water of Bear Creek in the Lake by reason of delivery of In Lieu Water to Mutual's system. The costs of In Lieu Water and Basin Make-up Water shall be borne solely by District as consideration for the right to retain an equivalent quantity of stored water in the Lake for District's account.

"25. *District's Right to Provide In Lieu Water.* . . . Such In Lieu Water may be provided from any one or more of the following sources, or any other source usable for Mutual's purposes, and of comparable quality to waters released or subject to release from the Lake: [¶] (a) Wells in San Bernardino Basin owned by Mutual. [¶] (b) Third party wells or other sources . . . . [¶] (c) Exchange water under the Mill Creek Exchange. [¶] (d) State Project Water.

". . . . . . . . . . . . . . . . . . .

"30. *District's Obligation to Maintain Dam.* Pursuant to District's stipulation and agreement, District shall perpetually maintain and protect the Dam and Lake to preserve and maintain the existing usable storage capacity of the Lake and shall comply with all dam safety regulations of the State of California or other appropriate public authority."

C. *Events After the 1977 Judgment*

In May 1980 the State Division of Safety of Dams advised the District that it was concerned about the ability of the dam to withstand flood-

seismic loads, and requested further evaluation by the District. The District's engineers recommended that a new dam be built immediately downstream of the existing dam. The engineers estimated that the new dam would cost $3.8 million, and would increase the capacity of the lake by 57 acre feet. Although the 1977 judgment obligated the District to "maintain and protect" the existing dam, it did not contemplate the construction of a new dam.

Another contingency which the judgment did not provide for was a change in the use of the water by Mutual's shareholders from agricultural to domestic and municipal use. Such a change was contemplated by Redlands when, some time after the judgment, it decided to build a multi-million dollar treatment plant in order to receive its share of Mutual's water for use in its municipal system.

As already noted, Redlands' use of Mutual's water before the 1977 judgment had been limited almost exclusively to irrigation. According to a declaration in the record, Mutual had represented to the District that "Mutual's use of water under the Judgment would, except in rare and unusual cases, be limited to irrigation." Historically, Mutual's demands for lake water for irrigation purposes had varied considerably from year-to-year and from month-to-month; on the average, Mutual had required 88.5 percent of its annual water needs during the five-month period from June through October, and only 11.5 percent of the water in the remaining seven months. These requirements had resulted in a maximum lake yield of 6,175 acre feet per year. According to District's analysis, a change from a (principally) five-month irrigation demand schedule to a year-round domestic/municipal schedule would result in an increase in lake evaporation and spills, and a decrease in maximum yield from 6,175 acre feet per year to 2,800 acre feet per year.

Otherwise, in April 1985, the District informed Mutual and Watermaster of the financial problems posed by the need for a new dam and the potential change in Redlands' use of Mutual's water from irrigation to domestic and municipal, and it therefore proposed that Mutual contribute to the cost of the dam by waiving its in lieu water requirements for at least five years, and that Watermaster modify or delete certain provisions of the judgment relating to the District's obligations thereunder. The District's proposals were rejected.

## II

### THE CURRENT ACTION

In May 1986 the District noticed a motion to interpret and modify the judgment. The motion was noticed under the same case number as the consolidated action which had resulted in the 1977 judgment, and the caption of the motion listed as defendants: Mutual; each of the Prior Rights Companies (North Fork Water Company, Lugonia Water Company and Redlands Water Company), and the San Bernardino Valley Water Conservation District. On the jurisdictional issue, which, to anticipate, is the only issue the District has raised in its appeal, the motion recited that the trial court had jurisdiction to interpret and modify the judgment pursuant to: (1) the court's express reservation of jurisdiction in the judgment (see *ante*); (2) *the court's inherent authority to modify a permanent injunction in the interest of justice or on a showing of a change in controlling facts*; and (3) the public trust doctrine.

Characterizing a change in controlling facts, the District alleged that: (1) Mutual's shareholders planned to change their use of Mutual's water from exclusive irrigation use to domestic and municipal use; (2) Mutual had lost part of its pre-1914 appropriative rights by nonuse for a continuous five-year period; (3) the District had filed an application with the State Water Resources Control Board for an appropriative water right to store water in the lake; (4) the dam was unsafe and had to be replaced; (5) the San Bernardino Valley Municipal Water District had replaced the "High Line" pipeline referred to in the judgment by a higher capacity pipeline; (6) the District had fewer groundwater wells to supplement its surface water supply; (7) the District was unable to perform its wastewater obligation under the judgment, and (8) Proposition 13 had decreased the District's financial resources.

Parenthetically, the public trust doctrine, if applicable here, contemplates that the lake is a significant public trust resource because it is used extensively for recreational activities and also supports a fishery and wildlife habitat, and that Mutual's proposal to change the categorical use of its water would substantially increase the quantity of Mutual's use and would threaten the District's ability to maintain lake levels for public trust use.

Returning to an account of what happened in the trial court, in its prayer, the District asked the trial court to "interpret and modify the Judgment as follows:

"(i) to preclude Mutual from changing the purpose of its use of water from irrigation to municipal and domestic uses;

"(ii) to reflect the established legal principle that a pre-1914 water right is lost by nonuse and to declare that Mutual has partially lost its rights;

"(iii) to revise, based on principles of equitable allocation, District's In-Lieu and High Line obligations, as set forth in the Judgment;

"(iv) to reflect changes in the availablity of groundwater wells to supply In-Lieu water;

"(v) to equitably allocate the construction costs of the new dam and to reallocate lake storage rights;

"(vi) to reflect the District's application to appropriate unappropriated water, now pending before the State Water Resources Control Board;

"(vii) to reflect changes in the law concerning wastewater reclamation;

"(viii) to adopt a workable and equitable conjunctive use plan for implementation of the Judgment."

Thereafter, Redlands applied for and was granted leave to file a complaint in intervention, on the alleged grounds that it owned a substantial percentage of the water stock of Mutual and of Lugonia Water Company and Redlands Water Company, two of the Prior Rights Companies, and that its, Redland's, ownership of such stock entitled it to receive water from those companies for "domestic, municipal and industrial purposes." Redlands' complaint in intervention included several affirmative legal contentions, e.g., that the trial court lacked jurisdiction to grant the District's motion.

Then, Redlands, Redlands Water Company, and North Fork Water Company (the third Prior Rights Company) noticed a motion to determine jurisdiction, and Mutual noticed its own such motion.

After considerable further briefing and a hearing, the trial court ruled that it had jurisdiction to grant the relief requested in item (i) (to preclude Mutual from changing the purpose of its use of water from irrigation to municipal and domestic) and item (v) (to allocate the construction costs of the dam and to reallocate lake storage rights) of the District's motion, and

that it did not have jurisdiction to grant the relief requested in the remaining six items (see *ante*).

At the conclusion of the jurisdictional hearing, the court reasoned that: (1) the 1977 judgment was the result of a stipulated agreement by the parties; (2) the intent of the parties to the agreement controlled the interpretation of the terms of the judgment; (3) the parties intended the court to reserve jurisdiction to interpret, enforce or carry out the judgment and not to modify the terms of the judgment to affect the substantive rights of the parties; (4) the court had jurisdiction over items (i) and (v) because those items sought to interpret rather than to modify the judgment, and (5) the court did not have jurisdiction over the remaining six items because those items sought to modify the judgment. The court also stated, at the hearing, that it did not have jurisdiction under the public trust doctrine. The court later entered a formal order which reflects the foregoing ruling. *The District did not seek appellate review of that later order.*

Thereafter, a four-day evidentiary hearing was held on items (i) and (v), and the trial court ruled against the District on both items, stating, in its formal order, that "Mutual's shareholders are not limited in the use of their water, and . . . the District is obligated to replace the Dam at its expense."

The District appealed from the order which had been entered after the evidentiary hearing (the February 4, 1987, order), and, in addition, purported to appeal from the jurisdictional order which had been entered several months before the evidentiary hearing (the October 24, 1986, order).

Otherwise, on the attorney fee issue, after the trial court had entered its formal order on the District's motion to interpret and modify the judgment: (1) Mutual noticed a motion for attorney's fees of $53,435 and costs of $2,982.39; (2) Redlands noticed a motion for attorney's fees of $69,809.30 and costs of $2,463.20; (3) North Fork Water Company (one of the Prior Rights Companies) noticed a motion for attorney's fees of $24,075 and costs of $2,662.09, and (4) the District noticed a motion to tax costs.

After a hearing on the foregoing motions, the court entered a ruling: (1) granting Mutual's and North Fork Water Company's motions for attorney's fees and costs; (2) granting Redlands' motion as to costs and denying the motion as to attorney's fees, the latter on the basis that Redlands, as an intervener, was not a party to the 1977 judgment which authorized that fees be awarded to "the prevailing party in any further proceedings," and (3) denying the District's motion to tax costs. Then, Redlands appealed from the portion of the ruling denying its motion as to attorney's fees, and the

District cross-appealed from the portion of the ruling awarding attorney's fees and costs.

While the appeals and the District's cross-appeal were pending, the District and North Fork Water Company entered into a partial settlement and filed a stipulation with this court which recited that: (1) the District abandoned its appeal of the February 4, 1987, order provided that its purported appeal of the October 24, 1986, order remained in full force and effect;[2] (2) the District abandoned that portion of its cross-appeal which related to the award of costs and attorney's fees to North Fork Water Company, and (3) North Fork Water Company agreed that it would not oppose the District's "appeal" of the October 24, 1986, order. Thereafter, this court: (1) dismissed the portion of the District's appeal in which the District challenged the February 4, 1987, order; (2) dismissed the portion of the District's cross-appeal in which the District challenged the award of attorney's fees and costs to North Fork Water Company, and (3) consolidated the District's appeal and Redlands' appeal (of the order denying it an award of attorney's fees).

## DISCUSSION

The District contends in its appeal that the trial court had jurisdiction to modify the 1977 judgment to: (1) adopt a conjunctive use plan; (2) reflect Mutual's alleged forfeiture of its water rights; (3) reflect changes in the law of wastewater reclamation, and (4) reflect the construction of new water conveyance facilities. Redlands contends in its appeal, because it became a party to the action as an intervener, that it is entitled to attorney's fees as a prevailing party therein. The District contends in its cross-appeal that the award of fees to Mutual is improper and should be vacated if the District prevails in its appeal.

## I

### A CONJUNCTIVE USE PLAN

■ The District contends first that the trial court had inherent authority under article X, section 2 of the California Constitution to modify the

---

[2] We have used the word "purported" to characterize the District's attempt to appeal from the October 24, 1986, order because, even if the order were appealable, the District's attempt to appeal therefrom was untimely. However, because the order is reviewable on the District's timely appeal from the February 4, 1987, order, we have treated the District's abandonment of that appeal as only a partial abandonment. (See *post.*)

physical solution injunction in the 1977 judgment to adopt a conjunctive use plan. We do not agree.

The District relies on the following provisions of article X, section 2: "It is hereby declared that because of the conditions prevailing in this State the *general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable,* and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. *The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water."* (Italics added by the District.)

The physical solution injunction in the 1977 judgment provided that the District could not interfere with Mutual's use of the water from the lake unless the District supplied Mutual with in lieu water of comparable quality at the District's expense from sources "usable for Mutual's purposes" and at locations designated by Mutual.

As to the final component of the District's argument, the adoption of a "conjunctive use plan," the record is neither clear nor consistent as to what the District means by the term "conjunctive use plan" or why the court should adopt such a plan. More specifically: (1) in the 1985 analysis by the District's engineer, Donald E. Evanson, which was an exhibit to the District's motion, the term "conjunctive use" referred to the conjunctive use of the lake and the Santa Ana River to meet Mutual's domestic needs. The analysis did not include a specific conjunctive use "plan," but suggested that "revised operational procedures *should be developed"* (italics added) as to the conjunctive use of the lake and the river; (2) in its motion, the District asked the court to adopt "a *workable* and *equitable* conjunctive use plan for implementation of the Judgment" (italics added); (3) in the memorandum of points and authorities in support of the motion, the District argued that "a conjunctive use plan would increase the *efficiency* of water use in the Santa Ana River Basin, *consistent* with the mandate of Cal. Const. art. X, § 2" (italics added).

On appeal the District argues that "The conjunctive use *plan* that *has been prepared* by the District's engineer, Donald E. Evanson, would result in increased *efficiency* in water use in the Santa Ana River-Big Bear Lake

system. However, as a result of [the trial court's] jurisdictional ruling, the District [now argues that it] was denied the opportunity to present evidence in the trial court concerning the increased *efficiency* that would result from its proposed conjunctive use plan. Given the *mandate* of article X, section 2 of the California Constitution, this was clear error." (Italics added.)[3]

There are manifest problems with this argument. First, Evanson, the District's engineer, did not prepare a "plan," much less a "conjunctive use plan," *until over five months after the District had filed its motion, and over two months after the trial court had moved on the District's motions to determine jurisdiction.*[4] What Evanson prepared *before* the District filed its motion, and what was submitted with the motion, was the analysis we have referred to, which was entitled: "Analysis of Water Supply Yields of Big Bear Lake Under Alternative Lake Operations" (hereafter, the analysis), and dated April 15, 1985. The words "conjunctive use" did not appear in the table of contents of the analysis and, insofar as we have discovered, appeared only four times in the ninety-four-page text, where they referred, in general terms, to the conjunctive use of the lake and the Santa Ana River which *should* be developed, and not to any specific plan which *had been* developed.[5]

In view of the foregoing, the trial court did not err in refusing to allow the District to present evidence of its "conjunctive use plan." There was no such evidence to present.

The second problem with the District's argument, even if we assume that Evanson's analysis constituted a conjunctive use plan and that such a plan would increase the "efficiency" in the use of the lake's water, is that there is nothing in article X section 2 of the California Constitution which refers to,

---

[3] On appeal the District defines "conjunctive use plan" as "a water management plan involving the coordinated use of surface and groundwater supplies so as to maximize the yield of available water sources. *See generally* Trelease *Conjunctive Use of Groundwater and Surface Water,* 27 Rocky Mtn. Min.L.Inst. 1853 (1982)."

[4] Evanson's plan is referred to in the stipulation for partial abandonment and partial dismissal of the District's appeal, *ante.* The plan is entitled "Coordinated Water Management Plan for the Santa Ana River and Big Bear Lake," and is dated October 20, 1986. The District filed its motion on May 13, 1986, and the court made its jurisdictional ruling on August 14, 1986. In its opening brief, District states that "the 'Evanson Plan' has been modified since the motion to modify was filed," i.e., that there was some sort of "plan" in existence at the time the motion was filed. *However, there is no such plan disclosed in the record, nor is any such plan referred to in the motion.*

[5] At oral argument, counsel for the District referred twice to "the conjunctive use plan that we *will* present to the trial court" (italics added) if the court's jurisdictional order were reversed. Implicit in all of this is the inescapable reality, had the trial court ruled otherwise on the jurisdiction issue, that the District would have had no "conjunctive use plan" to present at the time of the evidentiary hearing.

much less "mandates," the most "efficient" use of water resources. The Constitution refers to the "beneficial" use of water and to the "reasonable" use and diversion of water, and it is obvious that the most efficient use of water is not necessarily its most beneficial or reasonable use.

The third problem with the District's argument, and the final one we shall address, is that it ignores the procedural posture of the case here. More specifically, the District relies on cases in which: (1) private parties were allowed to invoke the trial court's *original* jurisdiction under article X, section 2, to prevent unreasonable water use or unreasonable method of diversion by *other parties* (*Environmental Defense Fund, Inc.* v. *East Bay Mun. Utility Dist.* (1980) 26 Cal.3d 183, 200 [161 Cal.Rptr. 466, 605 P.2d 1]), and (2) the trial court was advised to retain jurisdiction to modify its judgment under the predecessor to article X, section 2, in order to prevent the *supplier* of water (the East Bay Municipal Utility District) from unreasonably wasting water, and to protect the prior rights of the *supplied* entity (the City of Lodi) (*City of Lodi* v. *East Bay Mun. Utility Dist.* (1936) 7 Cal.2d 316 [60 P.2d 439]. Neither of the foregoing scenarios applies to the case here, in which the *supplier* entity, the District, sought to invoke the trial court's *continuing* jurisdiction under article X, section 2, in order to modify a physical solution which *it,* the District, had drafted and agreed to follow, and which it never alleged to constitute an unreasonable or wasteful use of water.

In view of all the above, the District's contention that the trial court had inherent authority under article X, section 2 to modify the physical solution injunction to adopt the District's so-called conjunctive use plan is without merit.

■ The District also contends that the trial court had jurisdiction to modify the physical solution injunction in accordance with the District's purported conjunctive use plan to adapt to changed conditions. Not so. The District relies on the following language in *United States* v. *Swift & Co.* (1932) 286 U.S. 106 [76 L.Ed. 999, 52 S.Ct. 460]: "*We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions, though it was entered by consent.* . . . Power to modify the decree was reserved by its very terms, and so from the beginning went hand in hand with its restraints. *If the reservation had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.*" (*Id.,* at p. 114 [76 L.Ed. at p. 1005], italics added by the District.)

In *Swift,* however, the Supreme Court had *reversed* the decree modifying the injunction, reasoning, in part, that "No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so *extreme and unexpected* as to justify us in saying they are the victims of oppression. *Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.*" (*United States* v. *Swift & Co., supra,* 286 U.S. 106, 119 [76 L.Ed. 999, 1008], italics added.)

In the case here, the "hardship" allegations in the District's motion were directed principally to its requests to preclude Mutual from changing the purpose of its use of water, and were not directed to its request to adopt a conjunctive use plan. Moreover, as we have already noted, the District made no showing that it had a conjunctive use plan for the court to adopt. Accordingly, it could hardly have made the additional showing, required by *Swift, ante,* that it would suffer *actual* hardship, oppression and wrong if its (then) *hypothetical* conjunctive use plan were not adopted.[6]

■ Finally, the District contends that the trial court had inherent authority under the public trust doctrine to modify the physical solution injunction "to impose a conjunctive use plan which will provide *additional* protection to public trust uses" (italics added), and, "[b]y refusing even to consider the adoption of a conjunctive use plan to protect public trust uses, the trial court abdicated its trust responsibilities." Again, we do not agree.

■ Under the public trust doctrine, California owns all " 'navigable' " lakes and streams and the lands lying beneath them " ' " as trustee of a public trust for the benefit of the people." ' " (*National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419, 434 [189 Cal.Rptr. 346, 658 P.2d 709].) "The state has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible. . . . [¶] Once the state has approved an appropriation, the public trust imposes a duty of continuing supervision over the taking and use of the appropriated water." (*Id.,* at pp. 446-447.)

■ In the case here, most of the District's argument is addressed to the threshold contention that the public trust doctrine applies to the lake despite its artificial character, because the lake is a "navigable" waterway used for boating. However, even if we assume that the public trust doctrine were to apply, imposing a *general* duty on the trial court to supervise the taking

---

[6] We are not saying that the judgment is frozen in concrete and can never be modified to adapt to changed conditions, but rather that the District did not make the requisite showing of such conditions in the case here.

and use of lake water, the District has made no attempt to show why that *general* duty should have been exercised in this *particular* case to modify the judgment to impose a conjunctive use plan. On the modification issue, the District argues that the trial court had the duty to protect the public trust resource of the lake "where feasible," but does not specify *why* it would have been feasible for the court to modify the judgment to adopt "a" conjunctive use plan, much less any such plan proposed by the District.

Further, the only authority the District cites on the modification issue is *National Audubon, ante*. However, as the following excerpt will show, that case is factually and legally distinguishable from the case here. In *Audubon*, the California Supreme Court reasoned that "The state . . . has the power to reconsider allocation decisions even though those decisions were made after due consideration of their effect on the public trust. [Fn. omitted.] The case for reconsidering a particular decision, however, is even stronger *when that decision failed to weigh and consider public trust uses. In the case before us, the salient fact is that no responsible body has ever determined the impact of diverting the entire flow of the Mono Lake tributaries into the Los Angeles Aqueduct. . . .*

"It is clear that some responsible body ought to reconsider the allocation of the waters of the Mono Basin. [Fn. omitted.] No vested rights bar such reconsideration. We recognize the substantial concerns voiced by Los Angeles—the city's need for water, its reliance upon the 1940 board decision, the cost both in terms of money and environmental impact of obtaining water elsewhere. Such concern must enter into any allocation decision. We hold only that they do not preclude a reconsideration and reallocation which also takes into account the impact of water diversion on the Mono Lake environment." (*National Audubon Society* v. *Superior Court, supra,* 33 Cal.3d 419, 447-448, italics added.)

In the case here, in contrast to *National Audubon,* the decision in question is one in which a responsible body *did* weigh and consider the public trust uses of the lake. More specifically, as we have already noted, the physical solution section of the 1977 judgment recites, at the outset: "*Need for Physical Solution.* There exists a need for additional water *for recreational and wildlife enhancement purposes* within District. There is not an economically feasible source of supplemental water available to meet the needs of District and its inhabitants for such purposes. . . . [¶] In general terms, the physical solution hereafter decreed will provide for retention of waters of Bear Creek in the Lake by reason of delivery of In Lieu water to Mutual's system." (Italics added.)

Moreover, the public trust allegations in the District's motion were directed to Mutual's proposed change in *use* of the water, and not to the manner in which the water was *delivered.*[7] Further, as we have noted repeatedly, the District did not present *any* conjunctive use plan for the delivery of Mutual's water, much less a plan which would provide "additional" protection for public trust uses of the lake.

In view of the foregoing analysis, the District's contention that the trial court abdicated its trust responsibilities by refusing to consider the adoption of a conjunctive use plan is without merit.

## II

### MUTUAL'S ALLEGED FORFEITURE OF ITS WATER RIGHTS

The District contends that the trial court erred in refusing to accept jurisdiction to determine if Mutual had forfeited its water rights under Water Code section 1241. Not so. Section 1241 recites, in relevant part: "When the person entitled to the use of water fails to use beneficially all or any part of the water claimed by him . . . for a period of five years, such unused water may revert to the public. . . . *Such reversion shall occur upon a finding by the [State Water Resources Control] board following notice to the permittee and a public hearing if requested by the permittee.*" (Italics added.)

In its reply brief the District concedes that the *finding* of reversion must be made by the board. (As already noted, the District alleged in its motion that it had filed an application with the board for an appropriative water right, and that the application was pending.) The District argues, nevertheless, that the trial court should accept jurisdiction of the issue and then should refer the case to the board for determination. If this were not done, the District argues, "[t]here would simply be no procedural mechanism for enforcing the [board's] finding of a forfeiture; the non-modifiable 1977 Judgment would be effectively immunized from any finding of forfeiture on the part of Mutual."

The flaw in the foregoing argument is the assumption that the *only* way to enforce a finding of forfeiture is to modify the 1977 judgment. First, as a

---

[7]The relevant allegation recites: "Big Bear Lake is a significant public trust resource that is used extensively for recreational activities. It supports a fishery and wildlife habitat. Mutual's proposal to change its purpose of use of delivered water, if carried out, will substantially increase the quantity of Mutual's use, threatening District's ability to maintain lake levels for public trust uses."

practical matter, the only reason a finding of forfeiture would need to be "enforced" would be if Mutual were unwilling to comply therewith, and we decline to assume such unwillingness. Next, even if Mutual were unwilling to comply with a finding of forfeiture, the District could enforce the finding through a *new* proceeding in administrative mandamus in the trial court. Such a proceeding would not be precluded by the 1977 judgment, and therefore the District's argument that the judgment would be "immunized" from the forfeiture is specious, with the result that its contention that the trial court should have accepted jurisdiction to prevent such immunization is meritless.

## III

### CHANGES IN THE LAW OF WASTEWATER RECLAMATION

At the time of the 1977 judgment, the District exported wastewater from Upper Bear Creek Watershed. Exhibit "D" to the judgment, entitled "WATERMASTER OPERATING CRITERIA," provides, beginning with the calendar year 1986, that any excess in gross export over gross import of water to the Upper Bear Creek Watershed "shall be credited against District's Basin Make-up Water obligation." Apparently the parties contemplated that the District would be able to reclaim the wastewater from the watershed by 1986, and apparently it has been unable to do so.

In its motion the District alleged that "[t]he wastewater reclamation provisions of the Judgment are no longer capable of being performed because wastewater reclamation is now legally impossible," and requested the court to modify the judgment "to reflect changes in the law concerning wastewater reclamation." The court refused to do so, on the grounds that "you don't change a judgment because there has been a change of law."

■ On appeal the District contends that the trial court had jurisdiction to modify the judgment to reflect changes in the law of wastewater reclamation, because it had become legally impossible to accomplish "the required action." However, the District was not "required" to replace the wastewater by reclamation; there is no reference to wastewater or to reclamation in the judgment, and the only reference to reclamation in Exhibit "D" to the judgment, *ante,* is as a "proposed" inflow to the lake.[8]

---

[8] The relevant provision in Exhibit "D" recites: *"Net Monthly Lake Inflow* shall be determined, together with its components of: [¶] (1) Natural inflow and precipitation on the Lake, plus [¶] (2) Diverted non-tributary inflows by reason of [¶] (a) Mutual's activity (i.e., Van Dusen Creek and Bluff Lake), [¶] (b) District's activity (such as, *but not limited to,* proposed Rathbone reclamation operation), less [¶] (3) Export from Upper Bear Creek Watershed."

Moreover, even if changes in the law of wastewater reclamation had made it impossible for the District to perform under the judgment, such impossibility would be an excuse or defense to nonperformance (Civ. Code, § 1511), rather than a basis for modifying the judgment.

The District also contends that changes in the law of wastewater reclamation gave the trial court jurisdiction to rescind the contract on grounds of mutual mistake. However, the District did not seek to rescind a contract on the grounds of mutual mistake, but sought to modify a judgment on the basis of the court's continuing jurisdiction to interpret, enforce or carry out the judgment. The former remedy has no relation to the latter, and, accordingly, cannot be used to supply a jurisdiction otherwise lacking.

Finally, the District relies on *United States* v. *Swift & Co., supra,* 286 U.S. 106, for the proposition that the trial court had jurisdiction to modify the physical solution injunction to adapt to the changed conditions in the law of wastewater reclamation. However, the physical solution injunction concerned only the District's supply of in lieu water to Mutual, and did not refer either to reclamation or to wastewater. Accordingly, the modification concepts of *Swift & Co.* are inapplicable to any changes in the law of wastewater reclamation in the case here.

In view of all the above, the District's contention that the trial court had jurisdiction to modify the judgment to reflect changes in the law of wastewater reclamation is without merit.

IV

THE CONSTRUCTION OF NEW WATER CONVEYANCE FACILITIES

The physical solution in the 1977 judgment required the District to divert a *minimum* of 12 cubic feet per second (cfs) into the Edison Conduit to satisfy Mutual's requirements for delivery of water through its High Line facility and to the Edwards Canal, and, to the extent that such diversion fell below 12 cfs, to make up any deficiency therein from water in storage in the lake. The capacity of the High Line is 9.1 cfs; the capacity of Edwards Canal is 2.9 cfs.

In 1985 the San Bernardino Valley Municipal Water District completed construction of the Greenspot Pipeline, which paralleled the High Line and had a much larger capacity (42 cfs) than the High Line. According to a declaration in the record, during the 1985 season, "flows of over 9.1 cfs [the

High Line capacity] were made in the Greenspot Pipeline, which increased the demand for In-Lieu water from District."

In its motion the following year the District alleged that the High Line had been augmented since the judgment by the much higher capacity Greenspot Pipeline, and asked the court to revise the District's High Line obligations. The court refused to do so, on the ground that the District was asking the court to change the rights set forth in the judgment, and that the court had no jurisdiction to make such a change.

■ On appeal the District contends that Mutual should not be allowed unilaterally to expand the District's High Line or in lieu obligations by using the Greenspot Pipeline, and, under the authority of *Swift & Co., ante,* that the trial court had jurisdiction to modify the judgment to adapt to such use. We do not agree.

In 1976, a year *before* the District agreed to (and drafted) the minimum requirements of its High Line obligation, 10 entities, including Mutual, Redlands, and the Prior Rights Companies, entered into an agreement which provided, among other things, that the San Bernardino Valley Municipal Water District would construct a High Line facility with a minimum capacity of 25 cfs. *That agreement was referred to in the physical solution section of the 1977 judgment* (VI, 25, (c), *ante,* at p. 370), and was also included as an exhibit to the District's motion to modify. Accordingly, the resulting increase in Mutual's demand for in lieu water because of its use of the Greenspot Pipeline, a demand which was limited by the judgment to 65,000 acre feet in any 10-year period, did not constitute "a clear showing of *grievous wrong* evoked by new and *unforeseen* conditions [which] should lead [the trial court] to change what was decreed after years of litigation with the consent of all concerned." (*United States* v. *Swift & Co., supra,* 286 U.S. 106, 119 [76 L.Ed. 999, 1008], italics added.)

In view of the foregoing, the District's contention that the trial court had jurisdiction to modify the judgment to reflect the construction of the Greenspot Pipeline is without merit.

## V

## REDLANDS' APPEAL

In any action on a contract which provides for attorney's fees incurred to enforce the contract, Civil Code section 1717 allows the party *to the contract* who prevailed in the action to recover such fees.[9]

In the case here, the contract, i.e., the 1977 judgment[10] recited that "[t]he Court may award attorneys' fees to the prevailing party in any further proceedings," and the trial court denied Redlands' request for attorney's fees on the ground that it had not been a party to the *judgment.* ■ On appeal Redlands contends that it was entitled to attorney's fees because, as an intervener, it had been a party to the *action.* Such a contention begs the question.

Citing *Catello* v. *I.T.T. General Controls* (1984) 152 Cal.App.3d 1009 [200 Cal.Rptr. 4], Redlands argues that an intervener becomes "a party to *the action,* with all of the same procedural rights and remedies of the original parties." (*Id.,* at pp. 1013-1014, italics added.) However, as Code of Civil Procedure section 1021 recites, a party to an *action* does not have a right to attorney's fees, except as provided by statute or contract, but does have a right to costs.[11] Significantly, the issue in *Catello* was whether the intervener was *liable for costs,* and the court held that it was. Parenthetically, we wonder if Redlands would have considered itself liable for the District's attorney's fees had the District been the prevailing party. Although Redlands states that "there would be a strong policy reason for requiring a defendant intervener to pay the cost of litigating the claim which it voluntarily defended," it cites no authority for the proposition that *it* would be required to pay such cost in the case here.

Redlands also argues that "[t]here appears to be little logic in allowing an intervener to suffer or recover costs while, at the same time, disallowing

---

[9] Civil Code section 1717 recites, in relevant part: "(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."

[10] The trial court found, because the judgment was the result of a stipulated agreement, that it was equivalent to a contract.

[11] Section 1021 recites: "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to their costs as hereinafter provided."

attorney's fees *because* the claimant is an intervener." (Original italics.) However, the logic is based on the distinction between a party to an *action,* which an intervener is[12] and a party to a *contract,* which, in this case, Redlands was not.[13] Moreover, the distinction is not "artificial," as Redlands argues, but is based on the distinction between attorney's fees and costs in section 1021, *ante,* a distinction which is based on long-established policy reasons we need not elaborate upon here.

In its reply brief, Redlands relies on *Montgomery* v. *Bio-Med Specialties, Inc.* (1986) 183 Cal.App.3d 1292 [228 Cal.Rptr. 709], where the third division of this district held that two of Bio-Med's shareholders, who were "*forced to intervene on behalf of Bio-Med*" *(id.,* at p. 1295) in a suit against Bio-Med for failure to repay a promissory note which the interveners had not signed and which included a provision for attorney's fees, were entitled to attorney's fees as prevailing parties.[14] In the case here, however, Redlands was not forced to intervene on behalf of Mutual,[15] nor would Redlands have been liable to the District for attorney's fees as an alter ego of Mutual, as the shareholder-interveners in *Montgomery* would have been liable to the plaintiffs in that case. (*Montgomery* v. *Bio-Med Specialties, Inc., supra,* 183 Cal.App.3d at pp. 1295-1296.) In view of the foregoing distinctions, *Montgomery* is inapplicable here.

Turning the alter ego theory on its head, and without citing any authority, Redlands also argues that it was entitled to attorney's fees because it intervened in the action to protect *its* water rights acquisition policy, and because none of the named defendants had the same incentive as Redlands to defend that policy. However, the interests of an intervener are relevant only to its right to intervene, and have absolutely no relevance to its right to attorney's fees, absent statutory or contractual rights thereto. Because Redlands had no statutory or contractual right to attorney's fees in the case here, its request therefor was properly denied.

---

[12] Code of Civil Procedure section 387 recites, in relevant part, that " . . . any person . . . may intervene *in the action or proceeding.* An intervention takes place when a third person is permitted to become a party *to an action or proceeding.* . . ." (Italics added.)

[13] As we have already noted, Redlands was awarded its costs in the case here.

[14] The shareholders were forced to intervene in the suit because two of Bio-Med's officers had also been named as defendants, and "[b]ecause of a potential conflict of interest beween Bio-Med and its officers . . . [the] shareholders intervened on behalf of Bio-Med to insure a good faith defense of this corporation." (*Id.,* at p. 1294.)

[15] Significantly, Redlands states, in its reply brief, that its "interest in this suit did not arise solely out of its status as a shareholder of Mutual. Rather, Redlands' *prime* motivation for intervention was to protect *its* right to receive water from Mutual under the 1977 Judgment." (Italics added.)

## VI

### MUTUAL'S ATTORNEY'S FEES

Finally, in its cross-appeal, the District contends that the order awarding attorney's fees to Mutual should be vacated if it, the District, prevails in its appeal, *ante.* Because the District did not prevail in its appeal, the order need not be vacated.

### DISPOSITION

The orders appealed from are affirmed.

Hollenhorst, J., concurred.